# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| AVEANNA HEALTHCARE, LLC (F/K/A BCPE EAGLE BUYER LLC), | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| | ) C.A. No. N20C-08-055 AML CCLD |
| EPIC/FREEDOM, LLC, and WEBSTER CAPITAL CORPORATION (A/K/A WEBSTER CAPITAL PARTNERS, and WEBSTER EQUITY PARTNERS), | ) ) ) ) ) ) |
| Defendants. | ) ) |

**Submitted: April 29, 2021**
**Decided: July 29, 2021**

## **MEMORANDUM OPINION**

**Upon Plaintiff's Motion for Judgment on the Pleadings:**
**DENIED**

**Upon Plaintiff's Ch. Ct. R. 56(f) Motion for An Extension of Time:**
**GRANTED**

**Upon Defendants' Motion for Judgment on the Pleadings:**
**DENIED**

**Upon Epic/Freedom LLC's Motion for Summary Judgment:**
**DENIED WITHOUT PREJUDICE**

Richard L. Renck, Esquire, Tracey E. Timlin, Esquire, of DUANE MORRIS LLP, Wilmington, Delaware, Robert M. Castle, III, Esquire, Randy D. Gordon, Esquire, of DUANE MORRIS LLP, Dallas, Texas, *Attorneys for Plaintiff Aveanna Healthcare, LLC*.

Kenneth J. Nachbar, Esquire, Miranda N. Gilbert, Esquire, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware, R. Todd Cronan, Esquire, Joseph P. Rockers, Esquire, of GOODWIN PROCTER LLP, Boston, Massachusetts, *Attorneys for Defendants Epic/Freedom, LLC and Webster Capital Corporation*.

**LEGROW, J.**

The buyer and the seller executed interrelated purchase agreements that memorialized the buyer's acquisition of two companies from the seller. To value the companies, the buyer used an accounting model that assumed the accuracy of certain financial statements prepared by the seller and its owner during the diligence phase of the parties' negotiations. The truth of those financial statements contractually was represented and warranted by the companies, but not by the seller or its owner. After the transaction closed, however, the buyer allegedly discovered the seller and its owner falsified the financial statements in a knowing, concerted effort to induce the buyer to agree to a purchase price higher than the seller and its owner otherwise could have achieved. The buyer filed this fraud action to recover damages from the seller and its owner for their knowledge of, and participation in, the companies' false contractual representations.

The seller responded with breach of contract counterclaims arising from the buyer's alleged failure to pay the entire agreed upon purchase price. Under the purchase agreements, the seller was entitled to receive an upfront payment, future payment of a federal tax refund, and distribution of escrowed funds. The buyer agreed to remit the tax refund to the seller no later than ten business days after the buyer received it. The seller was entitled to automatic distribution of the escrow funds unless the buyer properly lodged an indemnification claim against the seller within one year of the transaction's closing. The seller alleges the buyer wrongfully

refused to remit the refund despite the seller's attempts to collect it. The seller also alleges the buyer sidestepped the parties' indemnification notice requirements, which enabled the buyer to withdraw the escrow funds without the seller's objection. The parties have denied all wrongdoing and now move for judgment on the pleadings as to their respective claims.

The parties' motions present three independent questions that are controlled by unambiguous contract language arrived at through sophisticated, arms-length negotiation. First, may the seller and its owner escape liability for contractual fraud by citing anti-reliance language inapplicable to fraud claims that challenge a seller's knowledge of a company's false contractual representations? Second, may the buyer withhold the tax refund by invoking self-styled "conditions" unrelated to the refund's release? Third, did the buyer validly extract escrow funds held for the seller by providing an indemnification notice solely to the parties' escrow agent despite the buyer's duty to deliver a single notice to the escrow agent and the seller concurrently?

The Court answers each of these questions in the negative and declines to resolve any embedded factual issues. Accordingly, and for the reasons discussed below, the parties' motions for judgment on the pleadings are **DENIED**. Because fact discovery is necessary for the buyer's tax dispute defenses, the buyer's motion for an extension of time to respond to the seller's summary judgment motion is

**GRANTED**. Finally, because the seller's summary judgment motion presents equitable arguments, but also because this litigation's procedural history warrants granting the seller an opportunity to revise its arguments, that motion is **DENIED WITHOUT PREJUDICE**.

## BACKGROUND

This case concerns Aveanna Healthcare, LLC's ("Aveanna" or "Buyer") acquisition of Epic Acquisition, LLC and FHH Holdings, Inc. (the "Companies") from Epic/Freedom, LLC ("Epic" or "Seller") through an all-cash-for-stock transaction that was memorialized in a stock purchase agreement (the "SPA") to which Aveanna, Epic, and the Companies are parties. Aveanna contends Epic and its owner, Webster Capital Corporation ("Webster" and together with Epic, "Defendants"), priced the deal based on false contractual representations of the Companies' financials, inducing Aveanna's acceptance of negative value assets.[1]

Seller responded with two breach of contract counterclaims. First, Epic claims Aveanna improperly is withholding a federal tax refund afforded Seller under the SPA despite Buyer's duty to remit that refund no later than ten business days after Buyer receives it. Second, Epic claims Aveanna wrongfully extracted escrow funds segregated under a companion purchase agreement (the "Escrow Agreement")

---

[1] Aveanna initially sued a number of Defendants' managers in their individual capacities. It since has dismissed its claims against them. D.I. 34–35.

to true up the sale price by circumventing that agreement's notice and objection procedures.

## A. The Parties

Aveanna develops and sells home healthcare technology and personalized therapeutic services.[2] Aveanna operates primarily in the "enteral solution" space. Enteral solutions are food consumption products designed to assist patients who have difficulty ingesting nutrients without synthetic aids.[3]

Before the sale, Epic offered services and supplies similar to those offered by Aveanna.[4] When Epic entered the enteral solution industry, it began targeting the populations from which Aveanna solicited its clients.[5] Epic's expansion into Aveanna's market segment was pioneered by Webster, a private equity firm that owned a majority stake in Epic.[6]

## B. The Sale

During the fall of 2015, Webster directed Epic to purchase various home healthcare assets, including two lucrative enteral solution businesses.[7] Epic's acquisition of those firms strengthened Epic's influence over what was acclaimed

---

[2] D.I. 1, Compl. ¶ 14.
[3] *Id.*
[4] *Id.* ¶ 15.
[5] *Id.*
[6] *Id.* ¶¶ 8, 15.
[7] *Id.* ¶ 15.

publicly as a billion-dollar sector.[8] Given that news, Webster decided to put Epic's enteral lines up for sale in April 2016.[9]

Defendants hired investment banks and private consultants who generated financial performance analyses and documentation through which prospective buyers independently could assess Epic's financial health.[10] The reports purported to disclose the full extent of Epic's performance during its 2016 fiscal year.[11]

Around the fall of 2016, Aveanna expressed interest in purchasing Epic. A deal for Aveanna would include synergies, as managing Epic's enteral assets would allow Aveanna to control a wider share of the enteral solution market. Preliminary negotiations between Aveanna and Defendants concluded in December 2016, at which time Aveanna and Epic reached a purchase agreement in principle.[12] Under that agreement, Aveanna would acquire the Companies through an all-cash-for-stock merger. Before the merger, Epic would convey all its enteral assets to the Companies.

To finalize the transaction, the SPA's parties conducted diligence. Aveanna priced the Companies based on the projections and analyses prepared by

---

[8] *Id.* ¶ 16; *see generally* D.I. 44, Ex. A, Amy Or, *Webster Capital Explores Sale of Epic Health Services*, Wall St. J., https://www.wsj.com/articles/webster-capital-explores-sale-of-epic-health-services-1461245592 (last updated Apr. 21, 2016, 9:33 AM).
[9] Compl. ¶ 16.
[10] *Id.* ¶ 31.
[11] *Id.* ¶ 18.
[12] *Id.*

Defendants' advisors.[13]  The reports would survive closing as the contractually-defined and incorporated "Financial Statements."  Using the Financial Statements, Aveanna developed an earnings before interest, taxes, depreciation, and amortization ("EBITDA") model.  Based on that model, Aveanna agreed to purchase the Companies for $950 million.[14]  That figure aligned with price ranges produced by Defendants' third-party advisors, suggesting the Financial Statements were reliable. With that understanding, the transaction closed on March 16, 2017.[15]

## C. The Terms

### 1. The SPA

In addition to the parties' material representations, the SPA contains language governing the scope of permissible reliance, the viability of fraud claims, and the procedures surrounding tax refunds and indemnification claims and notices.

### a. Representations; Anti-Reliance; Fraud Carve-Outs

Under SPA Section 3.4, the Companies—but not Defendants—represented the truth of the Financial Statements.  Specifically, the Companies represented that the Financial Statements "present fairly in all material respects the consolidated

---

[13] *Id.* ¶ 21.

[14] The purchase price was subject to adjustments that could increase or decrease the price depending on certain corrections.  *See* D.I. 3, Ex. A § 2.3 (hereinafter "SPA").  For example, a revision to the Companies' net working capital increased the purchase price if the revised amount exceeded the total identified pre-closing.  *Id.* § 1.1 (defining "Net Working Capital Adjustment Amount"); *id.* § 2.3(b) (providing for increase); *id.* § 2.4 (describing payment procedure).

[15] Compl. ¶ 20.

financial condition and results of operations of Seller" and that the Financial Statements "were prepared in accordance with GAAP applied on a consistent basis."[16] The Companies also represented that they had no undisclosed liabilities.[17]

In the same Article, the SPA's parties drafted broad anti-reliance language that precluded Aveanna from relying on any representation not memorialized in the SPA. Specifically, the SPA's parties agreed:

> NONE OF SELLER, THE COMPANIES OR ANY OF THEIR DIRECT OR INDIRECT SUBSIDIARIES OR OWNERS, INCLUDING, WITHOUT LIMITATION CAPITAL III, L.P., WEBSTER CAPITAL II, L.P., WEBSTER CAPITAL II-QP, L.P., WEBSTER OR ANY OF THE REPRESENTATIVES, MEMBERS, MANAGERS, EMPLOYEES, DIRECTORS, OFFICERS, STOCKHOLDERS OR AFFILIATES OF ANY OF THEM HAS MADE ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, OF ANY NATURE WHATSOEVER . . . OTHER THAN THOSE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS AGREEMENT, THE TRANSACTION DOCUMENTS AND THE CERTIFICATES CONTEMPLATED HEREBY AND THEREBY AND THE COMPANIES AND ALL SUCH PERSONS HEREBY DISCLAIM ANY SUCH OTHER REPRESENTATIONS AND WARRANTIES.[18]

To reinforce this intent, the SPA's parties further agreed:

> [N]one of Seller, the Companies, their direct and indirect Subsidiaries or any representatives, members, managers, employees, officers, directors, stockholders or Affiliates of any of them, including, without limitation, Webster Capital II, L.P., Webster Capital II-QP, L.P., Webster Capital III, L.P. and their Affiliates, has made, and shall not be deemed to have made, any representations or warranties in the materials relating to the business of the Companies or their Subsidiaries made available to Buyer, including due

---

[16] SPA § 3.4(b).
[17] *Id.* § 3.4(c).
[18] *Id.* § 3.20(a).

diligence . . . and no statement contained in any of such materials or made in any such presentation shall be deemed a representation or warranty hereunder or deemed to be relied upon by Buyer or any of its Affiliates in executing, delivering and performing this Agreement and the transactions contemplated hereby.[19]

Highlighting the party-specific nature of the SPA's representations, Article IV—where Seller made separate representations—repeats this language verbatim.[20]

To reinforce its disclaimer of extra-contractual reliance, Aveanna expressly acknowledged the Companies' and Defendants' disclaimer of any extra-contractual representation:

> None of Seller, the Companies, their direct and indirect Subsidiaries or any representatives, members, managers, employees, officers, directors, stockholders or Affiliates of any of them, including, without limitation, Webster Capital II, L.P., Webster Capital II-QP, L.P., Webster Capital III, L.P. and their Affiliates and representatives, has made, and shall not be deemed to have made, any representations or warranties in the materials relating to the business of the Companies or their Subsidiaries made available to Buyer, including due diligence . . . or in any presentation concerning the business of the Companies and their Subsidiaries or others in connection with the transactions contemplated hereby or otherwise. . . . Buyer further acknowledges and agrees that, except for the representations and warranties contained herein, in the Transaction Documents and the certificates contemplated hereby and thereby, . . . any cost estimates, projections or other predictions, data, financial information, memoranda or offering materials or presentations, including any offering memorandum or similar materials made available by Seller, the Companies their direct or indirect Subsidiaries or owners or any . . . Affiliates of any of them, are not and shall not be deemed to be or to include representations or warranties of any of the foregoing . . . and are not and shall not be deemed to be relied upon by Buyer or any of its

---

[19] *Id.* § 3.20(b).
[20] *Id.* § 4.7(a)–(b).

Affiliates executing, delivering and performing this Agreement and the transactions contemplated hereby.[21]

Aveanna also agreed, through an integration clause, that the SPA is a fully-merged document.[22]

The SPA's parties carved contractual fraud liability out from the SPA's extensive anti-reliance and integration language. In Article III—where the Companies alone made representations—the SPA explains:

> [N]othing contained in this Agreement shall be construed to limit the recourse of any party in the event of fraud with respect to the representations and warranties set forth in this Agreement. . . .[23]

This language reappears three times.[24] Most notably, the SPA's parties included this language in a provision titled "No Recourse." Under the No Recourse provision, the SPA's parties generally agreed they could not sue each other's non-party "Affiliates."[25] But they also specifically agreed Affiliates can be pursued on a claim "with respect to fraud involving the representations and warranties contained in Article III [*i.e.*, those by the Companies], Article IV [*i.e.*, those by Seller], and Article V [*i.e.*, those by Buyer], or any certificate."[26]

---

[21] *Id.* § 5.8.
[22] *Id.* § 10.16.
[23] *Id.* § 3.20(c).
[24] *Id.* § 4.7(c) (the Seller's representations); *id.* § 9.4(b) (indemnification); *id.* § 10.17 (remedies).
[25] *Id.* § 10.17. The SPA defines "Affiliate" to include a party's controlling owner. *Id.* § 1.1.
[26] *Id.* § 10.17.

### b. Tax Returns; Tax Refunds

A federal tax refund served as partial consideration for the sale. The SPA's parties crafted a reticulated system for filing tax returns, remitting tax refunds, and defending audits initiated by the Internal Revenue Service (the "IRS" or the "Government"). First, under Section 6.9(e), Buyer and Seller agreed to "cooperate" on return filings (the "Cooperation Provision"). The Cooperation Provision states:

> Buyer, Seller and the Companies and their Subsidiaries shall cooperate fully, as and to the extent reasonably requested by the other parties, in connection with the filing of Tax Returns, the filing of any amended Tax Return for a Pre-Closing Tax Period (which amended Tax Return may only be filed at the request of Seller), any Tax audits, Tax proceedings or other Tax-related claims, the authorization and execution of any appropriate powers of attorney to accomplish the foregoing, allowing Seller to review Tax Returns to determine or verify the proper amounts payable as refunds hereunder. . . .[27]

Next, under Section 6.9(f), the SPA's parties enshrined Epic's right to any refund disbursed in connection with the Companies' transaction-based tax returns (the "Refund Provision"). The Refund Provision explains:

> Seller shall be entitled to receive from Buyer, the Companies or their Subsidiaries all refunds (or credits for overpayments) of Taxes of the Companies and their Subsidiaries (including any interest thereon) attributable to Pre-Closing Tax Periods (including as a result of any Transaction Deductions). . . .[28]

---

[27] *Id.* § 6.9(e).
[28] *Id.* § 6.9(f).

The Refund Provision charges Aveanna with filing an "IRS Form 1139 for any eligible carryback periods of the Companies and their Subsidiaries."[29] Once disbursed, Aveanna must remit the refund to Epic "no later than ten business days after receipt by" Aveanna.[30] The Refund Provision further provides that a remitted refund must reflect "the net of any [t]axes owed with respect to or as a result of such refund . . . and net of any expenses incurred in obtaining the refund."[31] If a remitted refund subsequently is "disallowed or clawed back" by the Government "for any reason," the SPA's parties agreed Epic "shall (or shall cause its equity holders to) return the full amount of such refund, plus any interest, penalties, and associated costs and legal fees."[32] Last, the Refund Provision declares:

> Notwithstanding anything herein to the contrary, any refund (or credit for overpayment) requested and/or payable to Seller pursuant to the provisions of this Section [] shall only be claimed and/or payable to the extent such refund (or credit for overpayment) is based on Tax positions that are claimed with a minimum "more likely than not" level of comfort, as reasonably determined in consultation with Seller pursuant to the provisions of this Section [] and [the Cooperation Provision].[33]

Finally, under Section 6.9(b), the SPA's parties planned for IRS audits (the "Audit Provision"). Under the Audit Provision, Epic has the power "to control . . . any audit . . . with respect to the [t]axes or [t]ax [r]eturns of the Companies . . .

---

[29] *Id.*
[30] *Id.* (capitalization omitted).
[31] *Id.*
[32] *Id.*
[33] *Id.*

11

including, . . . a [t]ax refund or credit to which [Epic] is entitled under [the Refund Provision]."[34]   The Audit Provision affords Aveanna the qualified right to "participate" in an audit "at its own expense."[35]   But Epic may exclude Aveanna from the audit's defense unless Epic intends to settle the audit in a manner that would "increase[e] a [t]ax liability of the Companies."[36]   Only if Epic intends to do so does it need Aveanna's consent.[37]

### c. Indemnification Claims; Indemnification Claim Notices

The SPA articulates the grounds and procedures for making "Indemnification Claims."  Under SPA Section 9.2(a)(i), Epic must indemnify Aveanna for, among other things, "the breach or inaccuracy of any representation or warranty made by the Companies or Seller" in the SPA or its attached documents.  To lodge such an Indemnification Claim, Aveanna must send Epic an "Indemnification Claim Notice."[38]   The SPA defines an Indemnification Claim Notice as "written notice describing a claim for indemnification under this Agreement, the amount thereof (if known and quantifiable), and the basis thereof."[39]

---

[34] *Id.* § 6.9(b).
[35] *Id.*
[36] *Id.*
[37] *Id.*
[38] *Id.* § 9.5(a); *see id.* § 9.4(a)(i) (explaining, in the context of a limitations period, that Indemnification Claim Notices are pre-conditions to coverage).
[39] *Id.* § 1.1.

After being notified, Epic may, "upon reasonable notice," "access . . . [Aveanna's] books and records . . . solely for the purposes of evaluating and responding to [an] Indemnification Claim, resolving any disputes with respect thereto, or responding to any matters or inquiries raised in [an] Indemnification Claim Notice."[40] In any event, the SPA observes that Aveanna is not entitled to indemnification until its losses exceed an "Indemnification Threshold" of $7.125 million—*i.e.*, the sum escrowed from the sale price for Indemnification Claims.[41]

### 2. The Escrow Agreement

Buyer and Seller executed the Escrow Agreement contemporaneously with the SPA. In addition to truing up the sale price, the Escrow Agreement allocates litigation risk by depositing collateral (the "Escrow Funds") with a third-party custodian (the "Escrow Agent") as security for Indemnification Claims.[42] Among the Escrow Agent's duties is its agreement to receive and respond to requests to release the Escrow Funds ahead of their automatic distribution to Seller, which was

---

[40] *Id.* § 9.5(a).
[41] *Id.* § 9.4(a)(iii).
[42] D.I. 46, Ex. A Recitals & § 2 (hereinafter "EA"). The Buyer's capital contribution comprised (i) $15 million or "Adjusted Escrow Funds"; and (ii) $7.125 million or "Indemnity Escrow Funds". *Id.* § 2(a). Both Funds are captured by the EA's definition of "Escrow Funds". *Id.* § 2(a)(ii). As a result, it seems reasonably clear that the entire $22.125 million operates to true up the sale price. The parties, however, do not dilate on the $15 million, focusing instead solely on proper ownership of the $7.125 million. Accordingly, and for simplicity, this decision uses "Escrow Funds" as shorthand for the Indemnity Escrow Funds only.

scheduled for March 16, 2018 (the "Final Escrow Release Date").[43]  Central to this dispute is the concept of an early release.

Under Escrow Agreement Section 4(b), Buyer may request that the Escrow Agent release the Escrow Funds "at any time prior" to the Final Escrow Release Date.[44]  To do so validly, Buyer must take two steps.  *First*, Buyer must "make a claim for indemnification from Seller pursuant to Section 9.2 of the" SPA.[45]  As observed, SPA Section 9.2 describes the grounds for indemnification, not the procedure for lodging an Indemnification Claim Notice.[46]  The Escrow Agreement does not incorporate any other section in Article IX of the SPA.  *Second*, Buyer must

> deliver concurrently to the Escrow Agent and Seller a written notice (an "Indemnification Notice") describing the claim, the amount thereof (if known and quantifiable, and which may include the amount of Losses actually suffered by the Buyer Indemnified Party and/or Losses which may in good faith be expected to be suffered by the Buyer Indemnified Party assuming in each case that all of the facts and circumstances forming the basis of the indemnification were true) and the basis of the claim (an "Indemnification Claim").[47]

Although the Escrow Agreement's Indemnification Claim is titled and defined identically in the SPA, the Escrow Agreement's "Indemnification Notice" is titled and defined differently than the SPA's Indemnification Claim Notice.[48]

---

[43] *Id.* § 4(f).
[44] *Id.* § 4(b).
[45] *Id.*
[46] *Compare* SPA § 9.2, *with id.* § 9.5.
[47] EA § 4(b).
[48] *Compare id.* (containing a "good faith" element), *with* SPA § 1.1 (omitting such element).

14

After Buyer takes these steps, Seller has 30 days to exercise one of two options.[49] Seller may choose not to contest Buyer's Indemnification Notice. Alternatively, Seller may file a written objection to Buyer's Indemnification Notice (a "Dispute Notice").[50] If Seller timely files a Dispute Notice, then the Escrow Agent may not release the Escrow Funds until the parties resolve the issue.[51] But, if Seller does not object, or if Seller fails to object before the 30-day deadline, then the Escrow Agent must release to Buyer the sum requested.[52]

Even in cases of no contest or neglect, however, the Escrow Agreement does not penalize Seller with a waiver of its right to challenge a release. To the contrary, the Escrow Agreement provides:

> No failure or delay by a party hereto in exercising any right, power or privilege hereunder shall operate as a waiver thereof, and no single or partial exercise thereof shall preclude any right of further exercise or the exercise of any other right, power or privilege.[53]

This "No Waiver" provision concludes by referencing Section 4, where the notice and objection procedures reside.

> The right of the Parties to receive all or a portion of the Escrow Funds under the circumstances described in Section 4 above is in addition to, and not in lieu of, any other remedies that any Person may have against another Person pursuant to the [SPA] in the event of a breach of, or other liability under, the [SPA].[54]

---

[49] EA § 4(b).
[50] *Id.*
[51] *Id.* § 4(c).
[52] *Id.* § 4(b).
[53] *Id.* § 15.
[54] *Id.*

## D. The Post-Closing Discoveries

After the transaction closed, the Companies experienced financial problems that prompted Aveanna to conduct an internal investigation. The investigation revealed material inaccuracies in, and undisclosed liabilities masked by, the Financial Statements.[55] Specifically, Aveanna learned the Defendants:

(1) booked phantom returns on the Companies' enteral assets, inflating earnings with unliquidated or disputed profits while hiding present losses;[56]

(2) overstated revenue from the Companies' rehabilitation assets by failing to adjust accounts receivable reserves to a level appropriately reflective of the Companies' cash streams and by ignoring evidence suggesting a need for adjustments;[57]

(3) understated the costs of goods sold by the Companies' enteral lines, resulting in the appearance of minimal production expenses that concealed an unreconciled accounting of inventory-based and other net operating losses;[58]

(4) understated the Companies' insurance expenses by declining to record reserves for incurred but unreported malpractice and professional liability claims;[59]

(5) omitted the extent of the Companies' exposure to liability under the Affordable Care Act;[60] and

(6) omitted the Companies' breach of a patent license with a third party, which Aveanna was required to settle.[61]

---

[55] Compl. ¶¶ 22–23.
[56] *Id.* ¶¶ 26–47.
[57] *Id.* ¶¶ 48–51.
[58] *Id.* ¶¶ 52–58.
[59] *Id.* ¶¶ 59–64.
[60] *Id.* ¶¶ 65–68.
[61] *Id.* ¶¶ 69–74.

Aveanna contends these misstatements were not mere scrivener's errors, but rather were the fruits of a concerted effort to deceive prospective buyers and inflate the Companies' sale price. As support for that contention, Aveanna pleads e-mail messages exchanged by managers on the sell-side during the sale process which suggest Defendants curated, or at least knew about, the falsity of the Financial Statements.[62] As examples, when Defendants' managers learned that the Companies were underperforming before the merger,

> (1) Epic's then-Chief Financial Officer wrote that Defendants would "fix" the Financial Statements so the Statements would "hit the . . . results" Defendants desired;[63]
>
> (2) a Webster vice president instructed Defendants' advisors to "scrub" the Financial Statements, and to "remove[]" "anything . . . detrimental";[64] and
>
> (3) Epic's former Chief Financial Officer exclaimed to another Epic officer that "[e]very $10K" of artificial earnings added to the Financial Statements would generate "$1,200–1,500" more in sale profits for the sell-side's managers "at a 10X [EBITDA] multiple!"[65]

At the pleadings stage, these messages and others make it reasonably conceivable that Defendants knew the Companies suffered considerable reversals, were overly leveraged, and could not be advertised credibly at the EBIDTA multiples Defendants' analysts projected and buyers were expected to match. These messages

---

[62] *Id.* ¶¶ 31, 33–39, 41–47.
[63] *Id.* ¶¶ 39, 41.
[64] *Id.* ¶ 46.
[65] *Id.* ¶ 47.

17

also support a reasonable inference that Defendants knew erasing detrimental entries from the Companies' Financial Statements would hew the Companies' EBIDTA to the prices Aveanna's model estimated.

**E. The Escrow Dispute**

Based on this investigation, Aveanna sent Epic an Indemnification Claim Notice on December 21, 2017. In that Notice, Aveanna cited its fraud allegations as the basis for its Indemnification Claim.

> [B]ecause Buyer valued the Companies based on the operating results presented by Seller and the Companies in the Financial Statements (and, particularly, based on EBITDA), Buyer's Losses as a result of these breaches include the diminution in value of the Companies associated with these representation and warranty breaches. Such diminution in value is calculated by taking into account the multiple used by Buyer to determine the enterprise value of the Companies (12.2x [] EBITDA). Accordingly, Buyer suffered Losses in an amount equal to at least $85,644,0001 as a result of these breaches. As such, Buyer demands payment in cash of an aggregate amount equal to the [] Escrow Funds.[66]

In that last sentence, Aveanna referenced the Escrow Funds obliquely. Aveanna's Indemnification Claim Notice did not mention that Aveanna would be seeking an immediate release of the Escrow Funds under Escrow Agreement Section 4(b).

But on the same day, and at the same time, Aveanna sent an Indemnification Notice to the Escrow Agent.[67] The Indemnification Notice, which is facially shorter than the Indemnification Claim Notice, did not contain as much granularity as the

---

[66] D.I. 46, Ex. B at 3–4.
[67] D.I. 46, Ex. C.

18

latter. To fill the gaps, Aveanna attached the Indemnification Claim Notice it sent Epic for the Escrow Agent's review.[68] Aveanna, however, did not send the Indemnification Notice it sent the Escrow Agent to Epic for Epic's review.

On January 24, 2018—33 days later—Epic responded to the Indemnification Claim Notice.[69] Epic tentatively denied Aveanna's allegations and noted that it would continue to assess the Indemnification Claim.[70] Epic also reserved its right, under the SPA, to access Aveanna's books and records.[71] About two months later, Epic sent Aveanna a follow-up letter. In its follow-up letter, Epic maintained its view that Aveanna's fraud allegations were baseless.

Oblivious to Aveanna's Indemnification Notice, Epic never filed a Dispute Notice with the Escrow Agent.[72] Without a Dispute Notice, the Escrow Agent treated Aveanna's request as uncontested, and the Agent released the Escrow Funds at the end of 30 days. Despite Epic's challenges to the allegations, Aveanna never mentioned the Escrow Funds' release to Epic.

## F. The Tax Refund Dispute

In late 2018, the Companies filed their tax returns. Consistent with the Cooperation Provision, Buyer and Seller collaborated on those returns.[73] Buyer and

---

[68] *Id.* at 2; *id.* at Attach.
[69] D.I. 46, Ex. D.
[70] *Id.*
[71] *Id.*
[72] D.I. 2, Defs.' Ans. & Countercls. ¶ 47.
[73] *Id.* ¶ 50.

Seller sought to maximize an eventual refund by taking tax positions that asserted advantageous tax losses. Buyer and Seller anticipated the Companies' refund would be credited in early 2019 and that their work would earn a $7 million payment from the IRS.

From the Government's perspective, a refund would belong to the Companies, not to Epic. As a result, a refund would be disbursed directly to the Companies. Under the SPA, Aveanna was obliged to intercept the Companies' refund and remit it to Epic within ten business days.

In the late spring of 2019, having heard nothing about the refund, Epic contacted Aveanna for an update. Aveanna replied that it had received the refund, but that it would not relinquish it.[74] As justification for that position, Aveanna opined that the refund likely would be subject to an IRS audit. Epic objected.[75] Weeks later, the Government did initiate an audit.[76] When Epic inquired, Aveanna asserted control over the audit. Epic initially consented to Aveanna's control over the audit, but then changed course.[77] On August 27, 2020, Epic sent Aveanna a

---

[74] *Id.* ¶ 51.
[75] *Id.* ¶ 52.
[76] *Id.* ¶ 53.
[77] D.I. 32, Pl.'s Ans. to Defs.' Countercls. ¶ 51. Epic concedes its initial consent. *E.g.*, D.I. 51 at 7–8.

demand letter in which Epic claimed that Aveanna's maneuvering violated the SPA.[78] Aveanna later ceded control of the audit, but it has not remitted the refund.[79]

## G. Procedural History

### 1. The Initial Superior Court Litigation

On August 6, 2020, Aveanna sued Defendants in this Court, seeking (i) damages from Defendants for fraudulent inducement and common law fraud stemming from their alleged knowledge of the misrepresentations and omissions in the Financial Statements; (ii) damages from Webster for aiding and abetting fraud; and (iii) a declaratory judgment that Aveanna is entitled to the Escrow Funds.[80]

On August 28, 2020, Epic filed counterclaims against Aveanna, seeking (i) specific performance of the tax refund's release and audit; (ii) advancement of the formerly-named individual defendants' expenses; and (iii) declarations that: Aveanna's fraud claims are barred by the SPA; Epic is entitled to the tax refund and to control the audit; and Epic is entitled to the Escrow Funds.[81] As to the Escrow Funds, Epic also alleged a breach of the SPA.[82]

After filing its counterclaims, Epic moved to transfer the entire case to the Court of Chancery based on its specific performance and advancement

---

[78] D.I. 3, Ex. C.
[79] Pl.'s Ans. to Defs.' Countercls. ¶ 49.
[80] Compl. ¶¶ 82–101.
[81] Defs.' Ans. & Countercls. ¶¶ 77–96.
[82] *Id.* ¶ 95.

21

counterclaims.[83]   In response, Aveanna moved to dismiss Epic's counterclaims under this Court's Civil Rule 12(b)(1), arguing this Court lacked subject matter jurisdiction over the specific performance and advancement counterclaims and that the Court of Chancery would not be the appropriate forum to litigate Aveanna's legal claims.[84]

On October 8, 2020, the Court granted Aveanna's motion and dismissed Epic's specific performance and advancement counterclaims without prejudice to Epic transferring those claims to the Court of Chancery.[85]

**2. The Court of Chancery Litigation**

On October 21, 2020, Epic sued Aveanna in the Court of Chancery for specific performance of the tax refund's release and audit, and advancement of the formerly-named individual defendants' expenses.[86]

During the Court of Chancery litigation, the parties resolved two issues. First, the parties settled the advancement counterclaim.[87]   Second, Aveanna ceded control of the tax audit to Epic.[88]   Those agreements winnowed Epic's complaint down to its specific performance claim for the tax refund's release.  Epic moved for summary

---

[83] D.I. 3, Defs.' Mot. to Transfer.
[84] D.I. 5, Pl.'s Opening Br. in Supp. of Mot. to Dismiss at 4–9.
[85] D.I. 45, 47.
[86] *See generally Epic/Freedom, LLC, et al. v. Aveanna Healthcare, LLC (f/k/a BCPE Eagle Buyer, LLC)*, No. 2020-0980 (hereinafter "Ct. Ch. Dkt. __").
[87] *Id.* 19.
[88] *Id.* 50.

22

judgment on that relief.[89]  In response, Aveanna again moved to dismiss on subject matter jurisdiction grounds, arguing that, though framed as equitable, the claim really was a legal one over which this Court could exercise jurisdiction.[90]  Aveanna also moved under Chancery Court Rule 56(f) for an extension of time to pursue discovery before opposing Epic's summary judgment motion.[91]

On March 19, 2021, the Court of Chancery accepted Aveanna's arguments and granted Epic the option to transfer its claim to this Court.[92]  In doing so, the Court of Chancery reasoned that this Court could provide adequate legal remedies, *e.g.*, damages for breach of the SPA, or a declaration that Aveanna has breached the SPA.[93]  The Court of Chancery also rejected Epic's prejudice arguments, which were based on the fact that Epic had filed a fully briefed summary judgment motion.  The court noted that Epic could have deferred its briefing, and, alternatively, that this Court likely would not require Epic to re-brief the motion.[94]  Having concluded that specific performance would be inappropriate relief, the court did not rule on Epic's summary judgment motion or Aveanna's Rule 56(f) motion.

---

[89] *Id.* 26.
[90] *Id.* 29.
[91] *Id.* 54.
[92] *Id.* 56; *see generally Epic/Freedom, LLC v. Aveanna Healthcare, LLC*, 2021 WL 1049469 (Del. Ch. Mar. 19, 2021).
[93] *Epic/Freedom*, 2021 WL 1049469, at *2–4.
[94] *Id.* at *4–5.

In light of the court's decision, Epic requested a transfer of its tax refund claim to this Court.[95] The Court of Chancery granted that request.[96] The Court of Chancery litigation now is closed.

### 3. The Instant Superior Court Litigation

In addition to Epic's previously filed summary judgment motion and Aveanna's Rule 56(f) motion, the parties have moved for judgment on the pleadings.[97] On April 29, 2021, the Court heard argument on the motions.[98]

## PARTIES' CONTENTIONS

## A. Judgment on the Pleadings

### 1. Defendants' Motion

In support of their motion, Defendants argue Aveanna's fraud claims are mostly, if not entirely, based on extra-contractual representations and therefore are barred by the SPA's anti-reliance language. Defendants further contend they cannot

---

[95] Ct. Ch. Dkt. 57.

[96] *Id.* 59.

[97] D.I. 43, 46.

[98] D.I. 62 (hereinafter "Hr'g Tr."). Given Aveanna's Rule 56(f) motion, the Court did not request oral argument on Epic's summary judgment motion. At the hearing, however, the Court questioned whether it had jurisdiction to resolve Epic's summary judgment motion, which is based on equitable relief alone. Hr'g Tr. at 91–93; *see Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 477 (Del. 1989) (dismissing appeal on subject matter jurisdiction grounds after having raised the issue *sua sponte* at oral argument); *see generally KT4 Partners LLC v. Palantir Techs. Inc.*, 2021 WL 2823567, at *24 (Del. Super. Ct. June 24, 2021) (observing that "the Court may question its own subject matter jurisdiction *sua sponte* at any time" (alteration and internal quotation marks omitted)). Given that colloquy, and Epic's brief, the Court finds it lacks subject matter jurisdiction over the relief on which Epic has moved. *See infra* Analysis.B.3. Accordingly, and for the procedural reasons discussed below, this decision denies Epic's motion without prejudice.

be liable for contractual fraud because the truth of the Financial Statements was represented by the Companies, not them. Defendants assert Aveanna inadequately has "shown" Defendants' knowledge of the Companies' alleged misrepresentations, and that they did not sign any closing certificates assuring Aveanna of the Financial Statements' accuracy. As a third alternative basis for dismissal, Defendants contend Aveanna's reliance was not justified because it received pre-closing price adjustments to account for misstatements in the Financial Statements. Finally, Defendants maintain Aveanna insufficiently has pleaded Webster's participation in the sale process, precluding aiding and abetting liability. Because of that, and due to a lack of contractual means for reaching Webster directly, Defendants contend Webster must be dismissed from this case.

In opposition, Aveanna cites Defendants' managers' messages in arguing its complaint sufficiently pleads Defendants' knowledge of the Companies' alleged misrepresentations. In Aveanna's view, these well-pleaded allegations are enough to support a reasonable inference that both Defendants are liable directly for fraud, and alternatively, that Webster secondarily is liable for fraud. Similarly, Aveanna points to the SPA's fraud carve-outs in contending Defendants cannot escape liability for intentional fraud. Aveanna also insists the reasonableness of its reliance is a factual issue not amenable to resolution at this stage.

## 2. Aveanna's Motion

In support of its motion, Aveanna argues Epic's tax refund counterclaim is unripe because Aveanna's duty to release the refund is subject to unsatisfied conditions precedent. In Aveanna's view, the parties must reach a "more likely than not level of comfort" on the tax positions reflected by the refund before Aveanna is obliged to remit it. Aveanna also maintains the SPA's "net of any taxes owed" language implies Aveanna may withhold a refund until an IRS audit concludes, which it has not in this case. Separately, Aveanna contends Epic has waived its escrow release counterclaim by not timely filing a Dispute Notice. Alternatively, Aveanna argues it has not violated the Escrow Agreement's notice and objection procedures because it informed Epic and the Escrow Agent of its Indemnification Claim at the same time. Aveanna insists a single notice of its intent to access the Escrow Funds is not required under the Escrow Agreement or the SPA. Aveanna suggests Epic should have inquired if it were unsure of whether the Escrow Agent received an Indemnification Notice from Aveanna.

In opposition, Epic argues there are no conditions precedent to Aveanna's tax refund release duties. Epic contends the "more likely than not" standard refers to tax positions taken during the return stage, not the refund stage. Epic also asserts the "net of any taxes owed" language reflects normal deductions subtracted from most refunds, and the audit procedures, in being controlled exclusively by Epic,

would preclude Aveanna from conferring with Epic on deductions during an audit anyway. As to the escrow issue, Epic argues the Escrow Agreement's unambiguous No Waiver language undermines Aveanna's waiver arguments. Moreover, Epic maintains the Escrow Agreement defines a single Indemnification Notice that is required in addition to the SPA's Indemnification Claim Notice. Epic asserts Aveanna's reading would frustrate the purpose of the Indemnification Notice, which is to afford Epic an opportunity to dispute control over the Escrow Funds. For that reason, Epic insists it had no duty to inquire into whether an Indemnification Notice has been filed.

## B. The Rule 56(f) Motion

In support of its motion, Aveanna argues discovery is necessary to prove its fact-based defenses to Epic's tax refund counterclaim because Epic alone possesses evidence suggesting it waived its immediate entitlement to the refund and agreed to Aveanna holding the refund until the IRS's audit concludes. As to waiver, Aveanna asserts any contractual no-waiver provisions may themselves be waived, but Aveanna requires discovery to satisfy the waiver standard. Aveanna also contends discovery is necessary to reveal the parties' mutual intent on how the Refund Provision, which may be ambiguous, should be construed.

In opposition, Epic contends the SPA prohibits waiver, rendering Aveanna's waiver-based discovery requests meritless. Alternatively, Epic contends, to the

extent a waiver may be found, Epic unambiguously retracted its waiver. Epic also asserts a subsequent agreement allowing Aveanna to withhold the refund does not exist, and if it did, Aveanna should have possession of the relevant material without discovery. Taken together, Epic insists Aveanna's motion amounts to nothing more than a delay tactic that should be rejected.

## STANDARD OF REVIEW

A party may move for judgment on the pleadings under Superior Court Civil Rule 12(c).[99] In deciding a motion under that rule, the Court accepts the truth of all well-pleaded facts and draws all reasonable factual inferences in favor of the non-moving party.[100] The Court accords the party opposing a Rule 12(c) motion the same benefits as a party defending a motion to dismiss under Rule 12(b)(6).[101] Accordingly, this Court will grant a motion for judgment on the pleadings only if, after drawing all reasonable inferences in favor of the non-moving party, there is no material fact in dispute and the moving party is entitled to judgment as a matter of law.[102]

---

[99] Del. Super. Ct. Civ. R. 12(c).
[100] *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund II, L.P.*, 624 A.2d 1199, 1205 (Del. 1993).
[101] *Alcoa World Alumina LLC v. Glencore Ltd.*, 2016 WL 521193, at *6 (Del. Super. Ct. Feb. 8, 2016), *aff'd sub nom.*, *Glencore Ltd. v. St. Croix Alumina, LLC*, 2016 WL 6575167 (Del. Nov. 4, 2016); *see Silver Lake Off. Plaza, LLC v. Lanard & Axilbund, Inc.*, 2014 WL 595378, at *6 (Del. Super. Ct. Jan. 17, 2014) ("The standard for a motion for judgment on the pleadings is almost identical to the standard for a motion to dismiss." (internal quotation marks omitted)).
[102] *V&M Aerospace LLC v. V&M Co.*, 2019 WL 3238920, at *3 (Del. Super. Ct. July 18, 2019).

## ANALYSIS

Resolution of the parties' motions turns on the proper interpretation of various provisions in the SPA and the Escrow Agreement. A contract's proper interpretation is a question of law.[103] In construing a contract, the Court strives "to fulfill the parties' shared expectations at the time they contracted."[104] "[B]ecause Delaware adheres to an objective theory of contracts," the Court also must interpret the contract in a manner that "would be understood by an objective, reasonable third party."[105] The Court therefore reads the agreement as a whole, giving purpose to each provision.[106] To that end, the Court construes "clear and unambiguous terms according to their ordinary meaning."[107]

"[J]udgment on the pleadings is a proper framework for enforcing unambiguous contracts," which only have one reasonable meaning and therefore do

---

[103] *Exelon Generation Acquisitions, LLC v. Deere & Co.*, 176 A.3d 1262, 1266–67 (Del. 2017).

[104] *Leaf Invenergy Co. v. Invenergy Renewables LLC*, 210 A.3d 688, 696 (Del. 2019) (internal quotation marks omitted).

[105] *Id.* (internal quotation marks omitted).

[106] *E.g.*, *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010); *see Sonitrol Holding Co. v. Marceau Investissements*, 607 A.2d 1177, 1183 (Del. 1992) ("[A] contract should be interpreted in such a way as to not render any of its provisions illusory or meaningless."); *NAMA Holdings, LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007) ("Contractual interpretation operates under the assumption that the parties never include superfluous verbiage in their agreement, and that each word should be given meaning and effect by the court."), *aff'd*, 2008 WL 571543 (Del. Mar. 4, 2008).

[107] *Leaf Invenergy*, 210 A.3d at 696 (internal quotation marks omitted); *see Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014) ("Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language." (internal quotation marks omitted)).

not create "material disputes of fact."[108]  As explained below, none of the provisions in either agreement is ambiguous.  The SPA's anti-reliance language does not bar Aveanna's fraud claims.  The SPA's tax provisions unconditionally require Aveanna to release tax refunds within ten business days of their receipt.  And the Escrow Agreement's notice and objection procedures require Aveanna to deliver a single Indemnification Notice to the Escrow Agent and Epic concurrently.  Accordingly, judgment on the pleadings cannot be granted to any moving party.

## A. Defendants can be liable for contractual fraud.

### 1. Aveanna's fraud claims are based on contractual representations and therefore fall outside the SPA's anti-reliance language.

Delaware enforces bilaterally negotiated agreements on their terms "as a matter of fundamental public policy."[109]  The policy promotes commercial consistency and predictable legal outcomes.[110]  That policy will, however, yield to

---

[108] *Lillis v. AT&T Corp.*, 904 A.2d 325, 329–30 (Del. Ch. 2006) (alteration omitted); *see also VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 615 (Del. 2003) (observing that ambiguity creates a fact dispute and that a court cannot dismiss breach of contract allegations unless the movant's construction of the disputed term "is the *only* reasonable construction as a matter of law"); *see generally Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012) (observing that a contract term is ambiguous only if it is "fairly or reasonably susceptible to more than one meaning").

[109] *NACCO Indus., Inc. v. Applica, Inc.*, 997 A.2d 1, 35 (Del. Ch. 2009); *accord Sycamore Partners Mgmt., L.P. v. Endurance Am. Ins. Co.*, at *5 (Del. Super. Ct. Feb. 26, 2021).

[110] *E.g.*, *Change Cap. Partners Fund I, LLC v. Volt Elec. Sys., LLC*, 2018 WL 1635006, at *4 (Del. Super. Ct. Apr. 3, 2018) ("With very limited exceptions, Delaware courts will enforce the contractual scheme that the parties have arrived at through their own self-ordering, both in recognition of a right to self-order and to promote certainty of obligations." (alterations omitted) (quoting *Ascension Ins. Holdings, LLC v. Underwood*, 2015 WL 356002, at *4 (Del. Ch. Jan. 28, 2015))).

"overriding" public policy concerns,[111] including Delaware's "firm public policy against fraud."[112]  In Delaware, contractual freedom ends where attempts to "immunize" contractual fraud begin.[113]

Striking a balance of these competing policies, Delaware has developed a body of law that permits sophisticated parties contractually to shift the risks posed by post-closing fraud claims.[114]  One such risk-allocation device is an anti-reliance provision that cabins "the universe of information" on which an aggrieved party later may ground a fraud claim.[115]  Using anti-reliance language, sophisticated counterparties "are free to limit the possibility of future claims of fraud or misrepresentation by contractually specifying what representations the parties are and are not making and relying upon."[116]  Through this exchange, parties necessarily agree that fraud claims are not viable when they are based on representations on which parties agreed they were not relying, even if the facts underpinning those

---

[111] *Unbound Partners Ltd. P'ship v. Invoy Holdings Inc.*, 251 A.3d 1016, `1032 (Del. Super. Ct. 2021).

[112] *Infomedia Grp., Inc. v. Orange Health Sols., Inc.*, 2020 WL 4384087, at *4 (Del. Super. Ct. July 31, 2020).

[113] *ABRY Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1061 (Del. Ch. 2006).

[114] *E.g.*, *EMSI Acquisition, Inc. v. Contrarian Funds, LLC*, 2017 WL 1732369, at *8–9 (Del. Ch. May 3, 2017).

[115] *FdG Logistics LLC v. A&R Logistics Holdings, Inc.*, 131 A.3d 842, 858 (Del. Ch. 2016) (internal quotation marks omitted), *aff'd*, 2016 WL 5845786 (Del. Sept. 30, 2016).

[116] *Infomedia*, 2020 WL 4384087, at *4.

claims are egregious. Put differently, by this arrangement, parties eliminate "extra-contractual" fraud claims while preserving "intra-contractual" fraud claims.[117]

Delaware law permits sophisticated counterparties to disclaim reliance on extra-contractual statements, *i.e.*, representations that are not memorialized in a fully-integrated agreement, even if those representations induced the agreement's acceptance.[118] But to eliminate extra-contractual fraud remedies, "the [parties'] intent to preclude reliance on extra-contractual statements must emerge clearly and unambiguously from the contract."[119] If the contract's language, "when read together, can be said to add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners," a fraud claim resting on extra-contractual statements will be barred.[120]

---

[117] *See generally RAA Mgmt., LLC v. Savage Sports Holdings, Inc.*, 45 A.3d 107, 117 (Del. 2012) (explaining distinction). The term "intra-contractual fraud" is a bit of redundancy; any fraud claim based on false contractual representations is "intra-contractual." Still, for the sake of clarity, the Court uses this term where appropriate as a helpful tool for drawing sharp distinctions between fraud claims based on extra-contractual representations and those based on contractually memorialized representations.

[118] *E.g.*, *Pilot Air Freight, LLC v. Manna Freight Sys., Inc.*, 2020 WL 5588671, at *21 (Del. Ch. Sept. 18, 2020); *Anschutz Corp. v. Brown Robin Cap., LLC*, 2020 WL 3096744, at *13 (Del. Ch. June 11, 2020); *IAC Search, LLC v. Conversant LLC*, 2016 WL 6995363, at *6 (Del. Ch. Nov. 30, 2016); *Haney v. Blackhawk Network Holdings, Inc.*, 2016 WL 769595, at *5 (Del. Ch. Feb. 26, 2016); *ITW Global Invs. Inc. v. Am. Indus. Partners Cap. Fund IV, L.P.*, 2015 WL 3970908, at *8 (Del. Super. Ct. June 24, 2015); *Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544, 551–56 (Del. Ch. 2001).

[119] *Kronenberg v. Katz*, 872 A.2d 568, 593 (Del. Ch. 2004).

[120] *Id.*

In contrast, Delaware law prohibits disclaimers of contractual fraud.[121] Delaware law does not permit a contract's parties to insulate themselves from liability for knowingly false representations memorialized in their agreement.[122] Instead, contracting parties only may limit the remedies available for contractual fraud under certain conditions.[123] Accordingly, Delaware courts will enforce agreements that clearly bar extra-contractual fraud claims but will not enforce agreements that bar intra-contractual fraud claims no matter the agreements' clarity.[124]

The SPA—governed by Delaware law[125]—maps these boundaries. As a starting point, Section 3.20 narrows the scope of permissible reliance to the representations made within the SPA. The accuracy of the Financial Statements and the completeness of the Companies' liability disclosures are two such memorialized

---

[121] *See ABRY*, 891 A.2d at 1062 ("[T]here is little support for the notion that it is efficient to exculpate parties when they lie about material facts on which a contract is premised.").

[122] *E.g.*, *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 136–37 (Del. Ch. 2009) ("Because of Delaware's strong public policy against intentional fraud, a knowingly false contractual representation can form the basis of a fraud claim, regardless of the degree to which the agreement purports to disclaim or eliminate tort remedies." (citing *ABRY*, 891 A.2d at 1061–64)); *Surf's Up Legacy Partners, LLC v. Virgin Fest, LLC*, 2021 WL 117036, at *11 (Del. Super. Ct. Jan. 13, 2021) ("Delaware courts refuse to enforce contracts purporting to condone—or at least insulate— intentional fraud.").

[123] *E.g.*, *Express Scripts, Inc. v. Bracket Holdings Corp.*, 248 A.3d 824, 830–32 (Del. 2021). Counterparties only can limit remedies for frauds committed with less than an intentional mental state. *See id.*

[124] *E.g.*, *RAA*, 45 A.3d at 117 ("[F]raud claims based on representations *outside* of a merger agreement . . . *can* be disclaimed through non-reliance language . . . [but] fraud claims based on 'false representations of fact made *within* the contract itself' . . . cannot be disclaimed." (alteration omitted) (quoting *ABRY*, 891 A.2d at 1059)).

[125] SPA § 10.9.

33

representations.[126]   Next, in Section 5.8, Aveanna expressly affirmed it was not permitted to rely on any statements made outside the SPA.[127]   Finally, to close the circle, the SPA's parties agreed the SPA is a fully-integrated document that contains the parties' complete understanding within its four corners.[128]   And, in respect for Delaware's "abhorrence" of false contractual statements,[129] the SPA's parties carved out of the SPA's anti-reliance language any fraud claims based on contractual representations.[130]   Taken together, these provisions exclude reliance on extra-contractual representations and bar fraud claims premised on statements that are not expressly contained within the SPA.[131]   Accordingly, the SPA bars Aveanna's fraud claims only if they challenge representations external to the SPA.

They do not.  Aveanna's fraud claims challenge the Financial Statements and disclosed liabilities representations.  Aveanna alleges the contractually incorporated reports that make those representations true or false were whitewashed by Defendants.  As support for that allegation, Aveanna cites the findings from its post-closing investigation, including Defendants' managers' e-mail messages.  Aveanna

---

[126] *Id.* § 3.4(b)–(c).
[127] *See, e.g.*, *McDonald's Corp. v. Easterbrook*, 2021 WL 351967, at *6 (Del. Ch. Feb. 2, 2021) (observing that anti-reliance provisions are enforceable only if the parties "forthrightly affirm that they are not relying upon any representation or statement of fact not contained [in the contract]" (alteration in original) (internal quotation marks omitted)).
[128] SPA § 10.16.
[129] *ABRY*, 891 A.2d at 1058.
[130] SPA §§ 3.20 (c), 4.7(c), 9.4(b), 10.17.
[131] *See Kronenberg*, 872 A.2d at 593.

did not discover the messages until the SPA already had been executed. Aveanna, therefore, did not rely on any statements in those messages in deciding to acquire the Companies. Instead, Aveanna relied only on what it was permitted to rely on: the Financial Statements. Had Aveanna now asserted reliance on extra-contractual representations, its fraud claims plainly would be barred by the SPA's anti-reliance language. Because it has not, however, Aveanna's fraud claims are not barred.

In arguing Aveanna's fraud claims impermissibly are tethered to extra-contractual representations, Defendants likewise point to their managers' e-mail messages. Defendants argue those messages are, in a literal sense, "extra-contractual," and they therefore cannot sustain a contractual fraud claim under the SPA. Defendants, however, mistakenly conflate the question of whether a plaintiff has relied on extra-contractual representations in the face of valid anti-reliance language with the question of whether the "evidence" the plaintiff intends to adduce is sufficient to prove contractual fraud.

Memorialized or not, a representation, by definition, is a statement, usually one of fact, made to induce a party to enter into a contract with the speaker.[132] The messages, unearthed after Aveanna already had chosen to enter the SPA, cannot be representations; Aveanna could not have reviewed them in deciding whether to deal

---

[132] *See, e.g.*, *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983); *Representation*, *Black's Law Dictionary* (11th ed. 2019) ("A presentation of fact . . . made to induce someone to act, esp[ecially] to enter into a contract. . . .").

with Epic. Indeed, Aveanna does not contend the *messages* are false representations. Instead, Aveanna contends the messages are probative of the *Financial Statements'* falsity. Aveanna may point to "external sources of information" to demonstrate the falsity of contractual representations without running afoul of the SPA's anti-reliance language.[133]

More importantly, Defendants' reasoning invariably would prevent a plaintiff from using post-closing discoveries of fraud to establish that a contractual representation is false—vitiating most fraud claims. In other words, Defendants invite the Court to collapse the well-established distinction between extra-contractual and intra-contractual fraud claims. The very precedents on which Defendants rely, *Infomedia Group, Inc. v. Orange Health Solutions, Inc.*[134] and *3M Company v. Neology, Inc.*,[135] contradict that result.

In *Infomedia*, the plaintiff grounded its fraud claim exclusively on extra-contractual misrepresentations and omissions.[136] The agreement, however, contained enforceable anti-reliance language that barred fraud claims asserting reliance on extra-contractual misrepresentations and omissions.[137] As a result, this Court dismissed the complaint. Here, Aveanna has not repeated the *Infomedia*

---

[133] *Prairie Cap. III, L.P. v. Double E Holdings Corp.*, 132 A.3d 35, 52 (Del. Ch. 2015).
[134] 2020 WL 4384087 (Del. Super. Ct. July 31, 2020).
[135] 2019 WL 2714832 (Del. Super. Ct. June 28, 2019).
[136] 2020 WL 4384087, at *1.
[137] *Id.* at *3–4.

plaintiff's mistake. Aveanna challenges SPA representations that incorporate statements on which Aveanna contractually was permitted to rely. Moreover, because of the plaintiff's theories, the *Infomedia* court had no occasion to consider the effect of anti-reliance language on claims alleging false contractual representations.

Unlike the *Infomedia* plaintiff, the *Neology* claimant brought both extra-contractual and intra-contractual fraud claims.[138] Like the *Infomedia* agreement, the *Neology* agreement contained enforceable anti-reliance language.[139] Given that language, the *Neology* court dismissed the extra-contractual fraud claims, but permitted the intra-contractual fraud claims to proceed.

> [The agreement's fraud carve-out] . . . confines [fraud] claim[s] to the representations and warranties in Article 3 and Article 4 of the APA and excludes reliance on any extra[-]contractual representations as required by the Non-Reliance Clause. Neology's fraud claims are permitted under the APA because they focus on an alleged misrepresentation in APA Section 3.5. To the extent, however, that Neology is relying on extra[-]contractual representations to support its fraud claims, reliance on those representations is barred by the Non-Reliance Clause. . . .[140]

Here, SPA Section 3.20(c), the parties' fraud carve-out, "confines" Aveanna's possible claims to the representations contained in the SPA. And, as discussed, the representations concerning the Financial Statements are contained in SPA Section

---

[138] *Neology*, 2019 WL 2714832, at *13–14.
[139] *Id.* at *2.
[140] *Id.* at *13.

3.4. Aveanna's intra-contractual fraud claims thus "focus[]" on Section 3.4. As a result, Aveanna's intra-contractual fraud claims bypass the SPA's anti-reliance language.

Undeterred, Defendants argue *Neology* stands for the proposition that "a broad anti-reliance provision—even with a fraud carve-out—prohibits a sophisticated buyer from relying on extra-contractual statements to support essential elements of its fraud claim."[141] Putting aside their flawed premise (*i.e.*, that Aveanna's fraud claims are extra-contractual), Defendants suggest the mere pleading of extra-contractual information infects otherwise permissible intra-contractual fraud claims and renders them extra-contractual. Neither *Neology*'s facts nor its reasoning permits this extreme inference. To the contrary, Delaware courts distill extra- and intra-contractual representations, and have deployed the same analysis *Neology* undertook in doing so.[142] Properly understood, *Neology* simply stands for the proposition that parties may not disguise an extra-contractual fraud claim as an intra-contractual fraud claim to avoid anti-reliance language. As explained, however, Aveanna's fraud claims do not so masquerade. Accordingly, they are not barred by the SPA.

---

[141] D.I. 57 at 6 (emphasis omitted).
[142] *E.g.*, *Novipax Holdings LLC v. Sealed Air Corp.*, 2017 WL 5713307, at *12–13 (Del. Super. Ct. Nov. 28, 2017) (dismissing extra-contractual fraud claims but allowing intra-contractual fraud claims to proceed despite existence of anti-reliance language); *accord CLP Toxicology, Inc. v. Casla Bio Holdings LLC*, 2020 WL 3564622, at *17, *19 (Del. Ch. June 29, 2020).

**2. That the Companies made the challenged representations is of no moment because Aveanna adequately has alleged Defendants knew about the Companies' false contractual representations.**

Moving beyond their anti-reliance arguments, Defendants alternatively contend they cannot be liable for contractual fraud because the Companies represented the truth of the Financial Statements, not Defendants. As their principal authority for this contention, Defendants offer *ABRY Partners V, LP v. F & W Acquisition LLC*.[143] Defendants do not dispute *ABRY*'s prohibition on intentional fraud disclaimers.[144] Defendants also do not seem to dispute *ABRY*'s "knowledge exceptions"—*e.g.*, that a seller can be liable for the false contractual representations of "the company" if the buyer adequately pleads the seller's knowledge of the company's misrepresentations.[145] Nonetheless, Defendants insist *ABRY*'s holding hinged on the seller's endorsement of the company's representations through signed "officer" or closing certificates, providing a contractual mechanism for suing the seller that Defendants avoided here. *ABRY*, however, was not so limited, and decisions following *ABRY* undercut Defendants' efforts to constrain *ABRY*'s reach.

---

[143] 891 A.2d 1032 (Del. Ch. 2006).

[144] *See, e.g.*, *id.* at 1064 ("To the extent that the Stock Purchase Agreement purports to limit the Seller's exposure for its own conscious participation in the communication of lies to the Buyer, it is invalid under the public policy of this State.").

[145] *See, e.g.*, *id.* ("[T]he public policy of this State will not permit the Seller to insulate itself from [fraud] if the buyer can show . . . the Seller knew that the Company's contractual representations and warranties were false.").

39

## a. Signed closing certificates were not essential to *ABRY*'s holding.

The *ABRY* case involved a buyer's acquisition of a seller's[146] portfolio company that was memorialized in a "carefully negotiated" purchase agreement.[147] "Before discussing the [agreement's] particular terms," the court contextualized the sale as one in which the seller, primarily a hedge fund and its affiliates, would have an "intense interest" in generating returns.[148] Given that context, the court found it "not surprising" that the agreement "recognized a distinction between the seller and the company . . . in addressing questions relating to liability."[149] One way the agreement recognized that distinction was by "carefully delineating what party is responsible for which representations and warranties."[150] The court found "the most important representation[]" in the agreement was one made "by the company and not by the seller"—a representation that the company's financial statements, disclosed during the diligence phase, were accurate.[151] The buyer expressly acknowledged that this representation was one "of the company alone."[152]

---

[146] The court's definition of "seller" comprised an asset management conglomerate of investment funds and affiliates together with the selling stockholder that owned the acquisition vehicle that contained the underlying asset. *Id.* at 1037. The acquisition vehicle and the asset collectively were "the company." *Id.* As discussed below, the *ABRY* sell-side's composition and managerial style bear a meaningful resemblance to the sell-side's operations in this case.

[147] *Id.* at 1063.

[148] *Id.* at 1038, 1040. For clarity, capitalization of *ABRY* umbrella terms (*e.g.*, "buyer") that are identical to ones used in this decision has been omitted throughout.

[149] *Id.* at 1041. The court also assumed that the seller was not familiar with the company's management intimately, making separate representations doubly important. *Id.* at 1040–41.

[150] *Id.* at 1041.

[151] *Id.* at 1042.

[152] *Id.* at 1043.

Still, the seller "back[ed] up the company's representations" in two ways.[153] First, the seller signed an "officer's certificate" that, among other things, affirmed the accuracy of the company's representations.[154] The court characterized the use of a certificate as not "novel" and "rudimentary" to "anyone familiar[]" with stock acquisitions.[155] Second, and more importantly, the seller "put its wallet behind the company's representations and warranties" by agreeing to indemnify the buyer "if the company's representations and warranties were incorrect."[156] The indemnification provision was the crux of the case. It purported to limit the buyer's recourse for future claims of intentional, contractual fraud solely to exhaustion of an indemnity account.[157] The court explained the seller had negotiated for this limitation to control its exposure to the "broadly-defined" liabilities it had assumed earlier, including a duty to indemnify the company's representations without regard to "materiality qualifiers" that elsewhere were imposed by the agreement's bring-down clause.[158]

After the transaction closed, the buyer "uncover[ed] a host of serious financial problems" with the company that could not have been concealed absent intentional

---

[153] *Id.*
[154] *Id.*
[155] *Id.* at 1041.
[156] *Id.* at 1043.
[157] *Id.* at 1044–45.
[158] *Id.* at 1043–44.

fraud.[159]  Specifically, the buyer contended the company and the seller "working in concert, schemed together to manipulate the company's financial statements in order to fraudulently induce the buyer into purchasing the company at an excessive price."[160]  As support for that theory, the buyer pointed to communications exchanged between the sell-side parties during the sale process in which the seller's and the company's managers seemed to misrepresent the company's financial statements intentionally.[161]  The court held those conversations supported a reasonable inference that the seller "had the opportunity and the motive to work with [the company's] management to influence the financial statements and the operating decisions to achieve desired numbers."[162]  The buyer therefore sued to rescind the agreement "largely on the basis that the company made false representations . . . and the seller provided a false officer's certificate."[163]  The seller moved to dismiss the complaint because the buyer sought recission rather than damages from the indemnity account.

The parties' arguments did not turn on, let alone prioritize, the certificates. The seller argued that even if the seller committed intentional fraud, the buyer could

---

[159] *Id.* at 1038.
[160] *Id.*
[161] *Id.* at 1051.
[162] *Id.*
[163] *Id.* at 1045.

not "hold the seller responsible for representations and warranties made by the company" because

> the parties carefully set forth which representations and warranties were made by the Company and which were made by the Seller. . . . In addition, the Buyer agreed to the Exclusive Remedy Provision stating that the only remedy that it had against the Seller for contractual misrepresentations was limited to . . . an Indemnity Claim. And, in that event, the Seller's liability is capped at the extent of the Indemnity Fund. . . . [T]he Seller only agreed to back Company representations to the extent of the Indemnity Fund.[164]

In opposition, the buyer responded with textual arguments that the court rejected as neither "linguistically [n]or logically appealing."[165] The court then summarized the buyer's alternative argument this way.

> [T]he Buyer contends that even if the Stock Purchase Agreement does limit the Seller's liability for misrepresentation to an Indemnity Claim by the Buyer, public policy overrides that aspect of the Agreement. According to the Buyer, a provision limiting in any manner the liability of a contracting party for misrepresentation is void. The public policy interest in deterring fraudulent conduct[,] says the Buyer, . . . prevents even sophisticated private equity firms from shaping acquisition agreements in which parties trade off price for limitations on liability.[166]

The buyer thus pitted the commercial inefficiency of contractual fraud against the commercial efficiency of enforcing voluntarily-negotiated contracts as written.

In considering the buyer's argument, the court did not focus its analysis on the closing certificates. Instead, the court identified policy considerations that

---

[164] *Id.* at 1052.
[165] *Id.* at 1053–55.
[166] *Id.* at 1052–53.

counseled against importing wholesale fraud exceptions into the realm of mergers and acquisitions. The court questioned whether "judicial decisions" are "the only way that commercial norms of fair play are instilled," since other factors, such as notoriety, could cause buyers "to discount the value of the tainted seller's portfolio companies" and "to demand greater remedial flexibility."[167] Similarly, the court observed that "[p]ermitting a party to sue for relief that it has contractually promised not to pursue" could "create the possibility that buyers will face . . . uncompensated costs," *e.g.*, zero-sum litigation that increases expenses inversely with monetary relief from the fraudulent transaction.[168] The court also worried that holding a seller liable for its portfolio company's contractual wrongdoing could blur the distinctness inherent to the corporate form.[169]

Against that conceptual framework, the court nevertheless acknowledged that "a concern for commercial efficiency does not lead ineluctably to the conclusion that there ought to be no public policy limitations on the contractual exculpation of misrepresented facts."[170] In line with this reasoning, the court found "little support for the notion that it is efficient to exculpate parties when they lie about the material facts on which a contract is premised."[171] Using the word "lie," the court drew on a

---

[167] *Id.* at 1061.
[168] *Id.* at 1062.
[169] *Id.* at 1063.
[170] *Id.* at 1062.
[171] *Id.*

"moral difference" dividing intentional and "unintentional misrepresentations of fact."[172] Using that distinction, the court held if a seller "knew that the company's contractual representations were false," the seller cannot "insulate" itself from contractual fraud by hiding behind the company's representations.[173] To demonstrate the requisite knowledge, the court crafted a disjunctive test under which the buyer must prove the seller "acted with an illicit state of mind, [*i.e.*,] that the seller knew that the representation was false and either [(i)] communicated it to the buyer directly itself *or* [(ii)] knew that the company had."[174]

> The closing certificates reappeared toward the end of the court's analysis.

> *In this case*, that distinction [between speakers] is largely of little importance because of the Officer's Certificate provided by the Seller. In that certificate, the Seller certified that (1) each representation and warranty of the Company and Seller was true and correct as of the closing date; (2) the Seller and Company performed and complied in all material respects with the agreements and covenants required to be performed or complied with; and (3) between the date of signing the Stock Purchase Agreement and closing, there had been no change, event or condition of any character which had or would

---

[172] *Id.* The court held that liability for unintentional misrepresentations of fact may be relegated to an indemnity account consistent with public policy. *Id.* at 1035 ("Delaware law permits sophisticated commercial parties to craft contracts that insulate a seller from a rescission claim for a contractual false statement of fact that was not intentionally made."); *id.* at 1064 ("If the Company's managers intentionally misrepresented facts to the Buyer without knowledge of falsity by the Seller, then the Buyer cannot obtain rescission or damages, but must proceed with an Indemnity Claim subject to the Indemnity Fund's liability cap."); *see also id.* at 1062 ("The level of self-investigation expected from a seller . . . seems to be a more legitimate subject for bargaining than whether the seller can insulate itself from liability for lies."); *id.* at 1064 n.85 ("[I]t is not unrealistic to assume that the contracting parties knew that there were public limitations that would come into play, to the extent the contract attempted to exculpate the Seller for lies about contractual representations.").
[173] *Id.* at 1064.
[174] *Id.* (emphasis added).

reasonably be expected to constitute a material adverse effect for the Company.[175]

In other words, the seller "knew that the [company's] representation was false" and both "communicated it to the buyer directly itself" *and* "knew the company had."[176] Having alleged facts that conceivably could satisfy the court's knowledge test, the buyer was permitted to seek remedies outside the indemnity account.

*ABRY*'s facts bear meaningful resemblance to those alleged here. Both cases involve sophisticated parties who executed carefully negotiated stock purchase agreements that memorialize an acquisition of a private equity firm's portfolio company. Both agreements differentiate the seller and the company's representations. Both agreements contain indemnity caps (though the SPA carves fraud out from them). Both sets of sellers contractually agreed to indemnify the company's representations. And both buyers discovered post-closing management messages indicating the controllers' knowledge of the companies' falsely represented financial statements. The only obvious difference is the *ABRY* seller signed an officer's certificate, whereas Defendants did not.

But the logic that animated *ABRY* neither hinges on nor requires the existence of signed closing certificates. Rather, *ABRY*'s logic can be distilled to the following

---

[175] *Id.* (emphasis added)
[176] *Id.*

principles, which, given the factual similarities, fairly can be transplanted into this case *mutatis mutandis*.

In portfolio company acquisitions, there are particularly "intense" incentives for sellers to distance themselves from fraud claims. Those claims may have the counterproductive effect of increasing transaction costs in a sale conceived to reorganize a portfolio without depreciating the value of the seller's other assets under management. To avoid or limit those losses, sellers frequently (i) push litigation risks onto the companies they sell by "carefully delineating" their own representations from their companies' representations; and (ii) cap recourse for misrepresentations with indemnification provisions. Delaware will respect these risk allocation techniques as a matter of commercial deference unless these techniques "insulate" sellers from liability for their knowledge of, or participation in, false contractual representations. Conversely, however, those limitations will not protect a non-representing seller when the buyer adequately pleads the seller was conscious of the company's lies.

Using these principles, the *ABRY* court treated the certificates as direct evidence of the seller's knowledge of the company's fraudulent representations, finding the seller communicated its knowledge personally through the certificates.[177]

---

[177] *E.g.*, *id.* at 1051 ("Moreover, Dominguez signed the Officer's Certificate required for the transaction to close in his capacity at both the Company and the Seller and certified that the Company's representations as to the financial statements were correct at the closing. . . . The Buyer

The court accordingly assigned "little importance"[178] to its distinction between the speakers. The fact that the seller and the company communicated the same fraudulent knowledge satisfied both disjunctive prongs of the court's test. Given the blatancy of the seller's knowledge, the court found the seller not only could be liable for its own communications, but also for its knowledge of the company's communications. Necessarily, then, the seller would have been liable for the company's fraudulent communications regardless of whether the seller had made its affirmations in signed closing certificates.

The linchpin of *ABRY*'s analysis, therefore, was the seller's knowledge, not its assurances. The *ABRY* court did not hold that the seller contractually must vouch for the company's representations through a signed closing certificate to be a proper fraud defendant. Instead, the court ruled broadly that a seller may be liable for intentional fraud whenever the seller knows the company's contractual representations are false.[179] That explains why the court wrote "in this case" when

---

pleads, and the Seller does not refute, that Dominguez is a principal of the Seller, which is being sued for fraudulent representation."); *id.* at 1051–52 ("I . . . will accept two of the Buyer's primary contentions as true for the sake of argument: (1) . . . that the Company made misrepresentations in its financial statements, the accuracy of which was represented and warranted in the Stock Purchase Agreement by the Company and in the Officer's Certificate by the Seller; and (2) that the [undisclosed liabilities] could have constituted a material adverse effect under . . . the Stock Purchase Agreement, thereby triggering a contractual duty to disclose the underlying facts to the Buyer on the Company's part, and on the Seller's part in the context of the Officer's Certificate.").

[178] *Id.* at 1064.

[179] *Id.* at 1064.

reintroducing the closing certificates.[180]   In the appropriate case, signed closing

certificates may lighten the plaintiff's pleading burden.   Whether the seller

communicated a false contractual representation, or the company did, is of "little

importance" when the seller knowingly signed for both.

This conclusion is not a new interpretation of *ABRY*'s scope.   Post-*ABRY*

decisions confirm that a seller can be liable for its knowledge of the company's fraud

regardless of closing certificates.

### b. Post-*ABRY* decisions make clear that signed closing certificates are not prerequisites for holding a seller liable for the company's fraud.

The Supreme Court often has cited *ABRY* approvingly.[181] It has declared

*ABRY* "accurately states Delaware law and explains Delaware's public policy" of

enforcing agreements that circumscribe some fraud liability.[182]   Still, the Supreme

Court positively has cited *ABRY*'s knowledge exception only in passing.[183]

Similarly, most lower courts have discussed *ABRY* in connection with choice-of-law

analyses, breach remedies, and anti-reliance jurisprudence, but not for the

---

[180] *Id.*

[181] *E.g.*, *RSUI Indem. Co. v. Murdock*, 248 A.3d 887, 904–05 & n.85 (Del. 2021); *NGL Cap., LLC v. NGL Energy Partners LP*, 249 A.3d 77, 96–97 & n.152 (Del. 2021); *Hazout v. Tsang Mun Ting*, 134 A.3d 274, 293 n.68 (Del. 2016); *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, 118 A.3d 175, 180 n.14 (Del. 2015); *EV3, Inc. v. Lesh*, 114 A.3d 527, 529 n.3 (Del. 2014); *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 341–42 & nn.34–35 (Del. 2013).

[182] *RAA*, 45 A.3d at 119; *see Express Scripts*, 248 A.3d at 830.

[183] *See Express Scripts*, 248 A.3d at 831 n.30.

knowledge exception.[184] Many others have examined the knowledge exception with respect to the seller's own fraud, but not the company's.[185] But the cases that have visited a seller's knowledge of the company's wrongdoing hold that, even "absent a contractual portal,"[186] a fraud claim may be maintained against a seller for the company's false contractual representations if the buyer successfully pleads the seller "'knew that the [c]ompany's representations and warranties were false.'"[187]

In *Prairie Capital III, L.P. v. Double E Holding Corp.*,[188] the Court of Chancery confronted a fraud challenge to a portfolio company transaction. The buyer alleged, among other things, that the seller knew the company falsely had represented the truth of its financial statements.[189] The seller, who neither represented the truth of the financial statements, nor provided a signed officer's certificate, countered that it could not be liable for the company's misrepresentations above the parties' contractual indemnification ceiling.[190]

---

[184] *E.g.*, *Focus Fin. Partners, LLC v. Holsopple*, 250 A.3d 939, 962–69 (Del. Ch. 2020) (choice of law); *Pilot Air*, 2020 WL 5588671, at *21–23 (anti-reliance); *Firmenich Inc. v. Nat. Flavors, Inc.*, 2020 WL 1816191, at *10 (Del. Super. Ct. Apr. 7, 2020) (remedies).

[185] *E.g.*, *Swipe Acquisition Corp. v. Krauss*, 2020 WL 5015863, at *11 (Del. Ch. Aug. 25, 2020); *Anschutz*, 2020 WL 3096744, at *15; *Addy v. Piedmonte*, 2009 WL 707641, at *20–21 (Del. Ch. Mar. 18, 2009).

[186] *EMSI*, 2017 WL 1732369, at *9.

[187] *Id.* (quoting *ABRY*, 891 A.2d at 1064).

[188] 132 A.3d 35 (Del. Ch. 2015).

[189] *Id.* at 59.

[190] *Id.*

50

In rejecting the seller's argument, the court first observed that a speaker may sustain vicarious liability for a false representation the speaker makes to a third person "[i]f the misrepresentation is made for the purpose of having it communicated" by that third person to the intended listener.[191]  Under those circumstances, the court reasoned that agency law principles would undermine the speaker's attempt to escape wrongdoing by using a mouthpiece.[192]  Turning to *ABRY*, the court noted that *ABRY* grappled with how to apply this guidance "to representations made by 'the Company' in stock purchase agreements."[193]  After working through *ABRY's* reasoning, the court held "the scope of a contractual fraud claim swe[eps] [] broadly" enough to capture a seller for its knowledge of the company's false contractual representations.[194]  In so holding, the court observed that when a seller causes the Company to "repeat" through contractual representations "false sales numbers" the seller "affirmatively encouraged," the seller "sp[eaks] for the Company" and therefore can be liable for its "participat[ion]" in the Company's fraud.[195]  With this understanding, the court permitted the buyer's

---

[191] *Id.* (internal quotation marks omitted).
[192] *Id.* at 59–60.
[193] *Id.* at 60.
[194] *Id.* at 60–61 (citing *ABRY*, 891 A.2d at 1064).
[195] *Id.* at 61 (internal quotation marks omitted); *see also id.* ("At the pleadings stage, it is reasonably conceivable that [non-representing sell-side parties] can be held liable for fraudulent contractual representations made by the Company. . . . [T]hey approved all documents and reports before anything was sent to [the buyer].  In other words, [they] were the brains behind the Company's business activities and the voice that relayed the details of those activities to the world.").

contractual fraud claims to proceed against the seller. More critically, the court allowed the buyer's claims to proceed even though the seller did not provide a signed closing certificate.

The relative unimportance of signed closing certificates was brought into sharper focus by this Court's decision in *ITW Global Investments Inc. v. American Industrial Partners Capital Fund IV, L.P.*,[196] which adopted *ABRY*'s reasoning. In *ITW*, the buyer argued it did not need to plead the seller's knowledge of the company's misrepresentations because, in the buyer's view, the seller's signed closing certificates established the seller's knowledge conclusively.[197] This Court rejected that argument as "unavailing."[198] In doing so, this Court observed that the *ABRY* seller signed a closing certificate, but the *Prairie Capital* seller did not.[199] Harmonizing both decisions, this Court held closing certificates are "one factor" "among many" that could lead to a finding that the seller knew the company's contractual representations were false.

> The execution of Officer's Certificates constitutes *one factor*, to be considered among many, that could support a showing of knowledge. In [*ABRY*] and *Prairie Capital*, the Court of Chancery looked at numerous facts and circumstances which could, if proven, support the conclusion that the [seller] *knew* of [the company's] misrepresentations.[200]

---

[196] 2017 WL 1040711 (Del. Super. Ct. Mar. 6, 2017).
[197] *Id.* at *8.
[198] *Id.*
[199] *Id.* at *7.
[200] *Id.* at *8 (first citing *ABRY*, 891 A.2d at 1051; and then citing *Prairie Cap.*, 132 A.3d at 60–62, 65).

52

*ITW* makes clear that a closing certificate neither is necessary nor sufficient to sustain a fraud claim against the seller based on the company's contractual representations.

Recent decisions issued by the Court of Chancery retreat even further from reliance on closing certificates. For example, in *LVI Group Investments, LLC v. NCM Group Holdings, LLC*,[201] the seller did not issue a closing certificate, but the Court of Chancery held the buyer could maintain a fraud claim against the seller for knowing about the company's alleged misrepresentations.[202] The same was true in *ChryonHego Corp. v. Wight*[203] and *Roma Landmark Theaters, LLC v. Cohen Exhibition Company LLC*.[204] Neither case involved signed closing certificates. Yet, both cases implemented *ABRY*'s knowledge exception to find a fraud claim satisfactorily pleaded against a seller for knowing about the company's alleged misrepresentations.[205] Collectively, these cases observe that knowledge may be derived from a variety of sources. No single source is dispositive.

In sum, *ABRY* and its progeny teach that a seller can be liable for the company's false contractual representations—even without a closing certificate—as

---

[201] 2018 WL 1559936 (Del. Ch. Mar. 28, 2018).

[202] *Id.* at *13 (As the [seller] point[s] out, the representations and warranties in the agreement were made by [the company], not the [seller]. But that is not fatal to [the buyer's] fraud claims." (first citing *ABRY*, 891 A.2d at 1064; and then citing *Prairie Cap.*, 132 A.3d at 61)).

[203] 2018 WL 3642132 (Del. Ch. July 31, 2018).

[204] 2020 WL 5816759 (Del. Ch. Sept. 30, 2020).

[205] *Roma Landmark*, 2020 WL 5816759, at *10–14; *ChryonHego*, 2018 WL 3642132, at *10.

long as the buyer adequately pleads the seller knew the company's contractual representations were false. Accordingly, the viability of Aveanna's fraud claims turns on whether Aveanna's complaint adequately pleads Defendants' knowledge of the Companies' alleged contractual fraud. It does.

### c. Under Rule 9(b), Aveanna sufficiently has pleaded knowledge.

Aveanna has brought common law fraud and fraudulent inducement claims against Defendants. These claims have the same elements,[206] specifically:

> (i) a false representation, usually one of fact, made by the defendant;
> (ii) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth;
> (iii) an intent to induce the plaintiff to act or to refrain from acting;
> (iv) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and
> (v) damage to the plaintiff as a result of such reliance.[207]

Relatedly, to hold a non-contract party liable for aiding and abetting contractual fraud, a plaintiff must allege "(i) underlying tortious conduct; (ii) knowledge; and (iii) substantial assistance."[208]

Under Superior Court Civil Rule 9(b), fraud claims must satisfy a heightened pleading standard.[209] Rule 9(b) requires that "the circumstances constituting fraud"

---

[206] *See Maverick Therapeutics, Inc. v. Harpoon Therapeutics, Inc.*, 2020 WL 1655948, at *26 & n.339 (Del. Ch. Apr. 3, 2020); *see also Surf's Up*, 2021 WL 117036, at *12 ("[A]ll fraud claims require proof of the same or nearly the same elements.").

[207] *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 144 (Del. Ch. 2004) (formatting added) (quoting *Stephenson*, 462 A.2d at 1074).

[208] *Agspring Holdco, LLC v. NGP X US Holdings, L.P.*, 2020 WL 4355555, at *20 (Del. Ch. July 30, 2020) (internal quotation marks omitted).

[209] Del. Super. Ct. Civ. R. 9(b).

be pleaded with particularity.[210] "The factual circumstances that must be stated with particularity refer to the time, place, and contents of the false representations; . . . the identity of the person(s) making the misrepresentation; and what that person(s) gained from making the misrepresentation."[211] "Essentially, . . . the plaintiff must allege circumstances sufficient to apprise the defendant of the basis of the claim."[212]

Knowledge, in contrast, "may be averred generally."[213] The same is true for an accomplice's knowledge.[214] In either case, allegations "that give rise to an inference of knowledge on the part of the pleader need not be pleaded with particularity."[215] Given this liberal standard, pleading knowledge in the contractual fraud context "is relatively easy."[216] "[A]n allegation that a contractual representation is knowingly false typically will be deemed well pled (even if

---

[210] *Avve, Inc. v. Upstack Techs., Inc.*, 2019 WL 1643752, at *5 (Del. Super. Ct. Apr. 12, 2019) (internal quotation marks omitted); *see generally Mooney v. E.I. du Pont de Nemours & Co.*, 2017 WL 5713308, *6 (Del. Super. Ct. Nov. 28, 2017) ("Rule 9's particularized pleading requirement ensures that a plaintiff cannot pursue a fraud claim merely because business plans did not pan out.").

[211] *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 207–08 (Del. Ch. 2006), *aff'd sub nom.*, *Trenwick Am. Litig. Tr. v. Billett*, 2007 WL 2317768 (Del. Aug. 14, 2007).

[212] *H–M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 145 (Del. Ch. 2003).

[213] Del. Super. Ct. Civ. R. 9(b).

[214] *E.g.*, *Agspring*, 2020 WL 4355555, at *20 ("Like the pleading requirements for fraud, the knowledge element of an aiding and abetting claim under Delaware law may be averred generally. . . .").

[215] *Kahn Bros. & Co., Inc. Profit Sharing Plan & Tr. v. Fischbach Corp.*, 1989 WL 109406, at *5 (Del. Ch. Sept. 19, 1989); *see Desert Equities*, 624 A.2d at 1208 ("Intent and state of mind . . . may be averred generally because any attempt to require specificity in pleading a condition of mind would be unworkable and undesirable." (internal quotation marks omitted)).

[216] *Prairie Cap.*, 132 A.3d at 62.

ultimately difficult to prove)."[217]  Still, when a fraud claim, "at its core," charges a defendant with knowing something, "there must, at least, be sufficient well-pleaded facts from which it can be reasonably inferred that this 'something' was knowable and that the defendant was in a position to know it."[218]  This "position to know" requirement governs fraud claims that charge a seller with knowing the company's contractual representations were false.[219]

Aveanna's allegations satisfy Rule 9(b).  After the transaction closed, Aveanna alleges it discovered the Companies had undisclosed operational and financial impairments.  Those discoveries prompted Aveanna to retain forensic analysts who, after investigating the Companies, concluded the Financial Statements were not compiled in compliance with GAAP and did not truthfully represent the Companies' financial health.  Following that investigation, Aveanna uncovered electronically-stored messages shared privately among Defendants' managers during the sale process that indicated Defendants knew the Companies had misrepresented the Financial Statements.  For example,

> (i) in September 2016, one of Seller's consultants reported that its analysis of "lagged cash collections" did not support the revenues reported in the Financial Statements.  In response, Seller's former Chief Financial Officer wrote that one of Webster's partners "direct[ed]" the consultant to rewrite the analysis such that a buyer could "find[] no changes to the . . . EBIDTA" the

---

[217] *Pilot Air*, 2020 WL 5588671, at *24 (citing *ABRY*, 891 A.2d at 1050).
[218] *Metro Commc'n*, 854 A.2d at 147 (internal quotation marks omitted).
[219] *See, e.g.*, *LVI*, 2018 WL 1559936, at *13 ("The question is whether [the buyer] has pleaded facts suggesting that the falsity of the financial statements 'was knowable and that [the seller was] in a position to know it." (alterations omitted) (quoting *Metro Commc'n*, 854 A.2d at 147)).

Companies had boasted. Webster had written the same on its own behalf in July 2016.[220]

(ii) In May 2016, Epic's then-CFO wrote to one of the Companies' financial officers, explaining he was "very concerned" that the revenue earned by Seller's enteral accounts receivable would show a shortfall for Q1 and Q2 2016.[221]

(iii) In June 2016, Epic's then-CFO wrote to the same financial officer that Seller likely would need to "write-off" the accounts receivable, which showed a $2 million deficit.[222]

(iv) In July and August 2016, Epic's then-CFO wrote that he anticipated Seller's efforts to collect receivables would be "futile," putting Epic in a "$4 million hole" "on an aggregate basis." That loss projection would rise to $5.2 million by September.[223]

(v) Speaking about those deficits, Epic's then-CFO planned to "get [them] fixed." In October 2016, he wrote that Seller's reported EBITDA was "set in stone," requiring Defendants to manipulate Seller's balance sheets to "hit the . . . results" Defendants' advisors forecasted.[224]

(vi) By late October 2016, Defendants, using accounting gambits like "pickups," wrote that they (artificially) had achieved the results its advisors had forecasted.[225]

(vii) Shortly before Buyer and Seller reached their December letter of intent, one of the Companies' executives wrote to another of the Companies' executives that the Companies had been missing their net-revenue targets "for many months." In response, the receiver cautioned that further communications with Seller should take place over the phone, as e-mails would be "discoverable if the new owners take action."[226]

---

[220] Compl. ¶¶ 31, 45.
[221] *Id.* ¶ 33.
[222] *Id.* ¶¶ 34–35.
[223] *Id.* ¶¶ 36–37.
[224] *Id.* ¶¶ 39, 41.
[225] *Id.* ¶ 42.
[226] *Id.* ¶ 43.

(viii) At the same time, Epic's then-CFO explained that it would be "disruptive" to disclose these losses during the sale process, noting further that key members of Defendants would not "raise [their] hand[s] to say" the Financial Statements were inaccurate.[227]

(ix) Finally, approximately one month before disclosing the Financial Statements, a Webster vice president wrote to one of Defendants' consultants that Epic's "databooks" should be "scrub[bed]" "to give buyers only what they really need to get to the revenue and EBIDTA" Defendants had set. The same officer added that the consultant should be "mindful of anything that could be detrimental to Epic," as Webster would "want that removed."[228]

These well-pleaded allegations support a reasonable inference that Defendants colluded to conceal many of the Companies' material liabilities and to manipulate the Financial Statements in a manner that unnaturally achieved the projections Defendants had advertised. Plainly, therefore, these well-pleaded allegations also support a reasonable inference that Defendants were "in a position to know" that the Companies' Financial Statements would be false if the Statements were not revised before disclosure.[229] Accordingly, Aveanna's fraud claims may proceed beyond the pleadings stage.

In opposition, Defendants press two unpersuasive arguments. First, Defendants emphasize repeatedly that Aveanna has not "shown" the Defendants' knowledge of fraud. This refrain ignores Rule 9(b). Under Rule 9(b), a claimant's

---

[227] *Id.* ¶ 44.
[228] *Id.* ¶ 46.
[229] *Metro Commc'n*, 854 A.2d at 147.

58

knowledge allegations need only be averred generally, not with trial-ready proof.[230]

And, on a pleadings-stage motion, Aveanna is entitled to benefit from favorable inferences, *e.g.*, that Defendants contrived the Financial Statements to meet their EBIDTA targets and induce a misleadingly-priced deal. Second, Webster insists, because it is not a party to the SPA, it cannot be snared in direct fraud liability. Under the SPA, however, the parties carved fraud perpetrated by Affiliates out from the No Recourse provision.[231] Webster is an Affiliate of Epic, its majority-controlled portfolio company.[232] The parties unambiguously agreed that Affiliates like Webster could not avoid direct liability for their knowledge of the Companies' false contractual representations.

### 4. Defendants' remaining challenges present factual issues not amenable to resolution on a motion for judgment on the pleadings.

Separate from their legal arguments, Defendants minimize Webster's involvement in the sale process, fault Aveanna for expecting fluid GAAP principles and an EBITDA model to produce trustworthy data, and stress that certain pre-closing disclosures rectified the errors Aveanna bemoans. These fact-intensive

---

[230] Del. Super. Ct. Civ. R. 9(b); *see Surf's Up*, 2021 WL 117036, at *15 (rejecting challenge to fraud claim that would have required claimant to prove fraud at the pleadings stage).
[231] SPA § 10.17.
[232] *Id.* § 1.1.

critiques cannot be resolved at the pleadings stage.[233] The undisputed facts in the record do not support judgment in Defendants' favor.

A complaint sufficiently pleads substantial assistance if it alleges "the secondary actor . . . provided assistance . . . or participation in aid of the primary actor's allegedly unlawful acts."[234] As explained, Aveanna alleges Webster partners and officers "direct[ed]" Defendants' advisors to fabricate the Financial Statements so as to legitimize Defendants' asking price. Aveanna also alleges a Webster vice president instructed one of Defendants' consultants to "scrub" detrimental liabilities from the Financial Statements. At the pleadings stage, these allegations are more than sufficient to apprise Webster of its "participation in" fraud[235] and of its "position to know" of the misrepresentations.[236]

Moreover, it is reasonable, at this stage, to conclude Aveanna was justified in evaluating the Companies using an EBIDTA model and GAAP principles. Defendants based the Companies' financials on an EBIDTA analysis and the

---

[233] *E.g.*, *McDonald's*, 2021 WL 351967, at *9 ("[T]he reasonableness of a plaintiff's reliance is a factual inquiry that is typically resolved with the benefit of discovery rather than at the pleadings stage." (internal quotation marks omitted)); *id.* at *9 n.60 (collecting authority); *NACCO*, 997 A.2d at 32 (The line between reasonable and unreasonable reliance "is difficult to draw and not something [courts ordinarily] address on" a challenge to the pleadings.); *see also Wilmington Tr. Co. v. Aetna Cas. & Sur. Co.*, 690 A.2d 914, 916 (Del. 1996) ("Whether . . . reliance on a misrepresentation was reasonable is a question for the jury.").

[234] *Agspring*, 2020 WL 4355555, at *21 (internal quotation marks omitted); *see* Restatement (Second) of Torts § 876 cmt. d (1977).

[235] *Agspring*, 2020 WL 4355555, at *21 (internal quotation marks omitted).

[236] *Metro Commc'n*, 854 A.2d at 147; *see Agspring*, 2020 WL 4355555, at *20 (observing that the "position to know" requirement applies to accomplices as well as principals).

Companies themselves represented that the Financial Statements were prepared "in accordance" with GAAP.[237] A buyer justifiably may rely on contractual representations.[238] Finally, Defendants' claim that a pre-closing, $6 million downward adjustment corrected misstatements about the Companies' enteral assets is unresponsive to Aveanna's allegations. According to Aveanna, the enteral assets were overvalued by $6.9 million, not $6 million.[239] Defendants' reactive, and incomplete, attempt to avoid a post-closing fraud claim with last-minute diligence further supports the reasonable inference that the price had been adjusted to throw Aveanna farther from their trace.

To reiterate, the SPA's anti-reliance language is inapplicable to Aveanna's fraud claims. Defendants directly may be liable for their alleged knowledge of the Companies' false contractual representations. Direct liability aside, the complaint supports a reasonable inference that Webster may have aided and abetted fraud. Defendants are free to pursue their fact-based challenges, and to clarify their role in the diligence process, with discovery. Their motion is denied.

---

[237] SPA § 3.4(c).
[238] *See, e.g.*, *FdG Logistics*, 131 A.3d at 858 ("Delaware law enforces clauses which identify specific information on which a party has relied and foreclose reliance on other information.").
[239] Compl. ¶ 29.

**B. Aveanna's withholding of Epic's tax refund amounts to breach of the SPA unless Aveanna can establish a fact-based defense to breach.**

**1. Under the SPA, Aveanna plainly was required to remit Epic's tax refund no later than ten business days after receiving it.**

Turning to Aveanna's motion, the Court begins with the parties' tax refund dispute. SPA Section 6.9 details a sequential procedure for filing returns and remitting refunds. First, under the Cooperation Provision, Aveanna and Epic collaborate on tax positions likely to minimize regulatory scrutiny and to maximize a refund. Second, Aveanna directs the Companies to file a return that embodies those positions. Third, under the Refund Provision, Aveanna intercepts, on Epic's behalf, any refund disbursed to the Companies. Finally, Aveanna remits the refund to Epic no later than ten business days after Aveanna intercepts it.

Aveanna admits it intercepted a refund from the collaborative return the Companies filed. Aveanna, however, did not remit the refund to Epic within the ten-day deadline. Under the SPA's plain language, therefore, Aveanna violated the parties' refund procedures. Accordingly, Aveanna is not entitled to judgment as a matter of law.

**2. There are no conditions precedent in the Refund Provision.**

Aveanna's unwillingness to remit the refund puts it in breach of the SPA. Recognizing this, Aveanna tries to graft two "conditions precedent" onto its refund release duties. In Aveanna's view, the Refund Provision's "more likely than not

62

level of comfort" language is a condition that requires the parties to confer on the tax positions expressed in the *refund* before Aveanna releases it. Aveanna explains, without such a conference, Aveanna might remit a refund imperiled by an IRS clawback claim, leaving Aveanna responsible for a delta while Epic receives a windfall. As support for this reading, Aveanna identifies a second condition in the Refund Provision: the "net of any taxes owed" language. Aveanna insists, by including this language, the parties tacitly agreed that no refund may be released until an IRS audit is initiated and ultimately concludes. Aveanna's reasoning is difficult to follow and, more importantly, is not supported by the SPA.

The existence of a condition precedent is a question of contract interpretation, and therefore, of law.[240] A condition precedent is "an act or event, other than a lapse of time, that must exist or occur *before* a duty to perform something promised arises."[241] Although "[t]here are no particular words that must be used to create a condition precedent,"[242] a condition precedent must be expressed clearly and

---

[240] *See, e.g.*, *Casey Emp. Servs., Inc. v. Dali*, 1993 WL 478088, at *4 (Del. Nov. 18, 1993).
[241] *Thomas v. Headlands Tech Principal Holdings, L.P.*, 2020 WL 5946962, at *5 (Del. Super. Ct. Sept. 22, 2020) (emphasis added) (internal quotation marks omitted); *see* Restatement (Second) of Contracts § 224 (1981) (hereinafter the "Restatement of Contracts") (same). Delaware trial courts have followed the Restatement of Contracts when analyzing issues related to conditions precedent. *E.g.*, *S'holder Rep. Servs. LLC v. Shire US Holdings, Inc.*, 2020 WL 6018738, at *18–19 (Del. Ch. Oct. 12, 2020); *SJM Soft.Com, Inc. v. Cross Country Bank*, 2003 WL 1769770, at *12–13 (Del. Super. Ct. Apr. 2, 2003). The Supreme Court likewise has looked to the Restatement of Contracts for guidance on conditions precedent. *E.g.*, *Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, 159 A.3d 264, 273 & n.34 (Del. 2017) ("*Williams II*"); *id.* at 277–78 & n.56 (Strine, C.J., dissenting). The Court, therefore, invokes the Restatement of Contracts where appropriate.
[242] *Thomas*, 2020 WL 5946962, at *5 (internal quotation marks omitted); *see also Shire*, 2020 WL 6018738, at *18 ("[T]he difference between a condition precedent and a condition subsequent 'is

unambiguously.[243]  If the Court finds a condition precedent, then the burden is on the party claiming breach to demonstrate that the condition on which the underlying obligation is contingent has been satisfied.[244]  An unexcused and unsatisfied condition keeps a dependent duty from accruing, thwarting an otherwise ripe breach claim.[245]

The first of Aveanna's conditions concerns the Refund Provision's "more likely than not level of comfort" language.[246]  "More likely than not" is a term of art under federal tax regulations.[247]  It is one of three degrees of certainty measured by

one of substance and not merely of the form in which the provision is stated.'" (quoting Restatement of Contracts § 230 cmt. a)).

[243] *E.g.*, *Voltaire Contractors, Inc. v. Coastal Mech., Inc.*, 1986 WL 13982, at *1 (Del. Super. Ct. Dec. 1, 1986); *accord Thomas*, 2020 WL 5946962, at *5; *see also QC Holdings, Inc. v. Allconnect, Inc.*, 2018 WL 4091721, at *7 (Del. Ch. Aug. 28, 2018) ("For a condition to effect a forfeiture, it must be unambiguous.  If the language does not clearly provide for a forfeiture, then a court will construe the agreement to avoid causing one." (internal quotation marks and citation omitted)).

[244] *E.g.*, *Shire*, 2020 WL 6018738, at *17; *see also Williams II*, 159 A.3d at 273 ("[O]nce a breach of a covenant is established, the burden is on the breaching party to show that the breach did not contribute materially" to the non-occurrence of the condition. (citing Restatement of Contracts § 245 cmt. b)).

[245] *See, e.g.*, *Lennox Indus. Inc. v. All. Compressors LLC*, 2020 WL 4596840, at *3 & n.15 (Del. Super. Ct. Aug. 10, 2020) (dismissing claim as unripe because claimant failed to undertake compulsory pre-litigation dispute resolution, which was a "condition precedent to litigation" (internal quotation marks omitted)); *cf. Brazen v. Bell Atl. Corp.*, 1997 WL 153810, at *2 (Del. Ch. Mar. 19, 1997) ("[The] claim is not dependent on occurrence of [a] condition precedent, and is, therefore, ripe for adjudication."); *see generally* Restatement of Contracts § 235(2) ("When performance of a duty under a contract is *due* any non-performance is a breach." (emphasis added)).

[246] *See* SPA § 6.9(f).

[247] *See* 26 C.F.R. § 1.6694–2(b) (describing penalties for "understat[ed]" tax returns "due to an unreasonable position" and discussing the "more likely than not" standard); *see also Williams Cos., Inc. v. Energy Transfer, L.P.*, 2016 WL 3576682, at *11 (Del. Ch. June 24, 2016) ("*Williams I*"), *aff'd*, *Williams II*, 159 A.3d 264; *see generally* Michael B. Lang & Jay A. Soled, *Disclosing Audit Risk to Taxpayers*, 36 Va. Tax Rev. 423, 427–30 (2017) (explaining "audit risk" in connection with tax positions filed during the return phase).

a "should" opinion in which a tax professional advises a client on whether the IRS is likely to challenge a tax position the client seeks to take.[248] A tax professional renders a "more likely than not" recommendation when the client's proposed positions have at least a "51%" chance of earning regulatory imprimatur.[249] Temporally, then, the client must be advised on the "more likely than not" standard *before* a return is filed.[250] Given the inclusion of other technical tax language in the Refund Provision, the only reasonable reading of the "more likely than not" phrase is one that is consistent with its technical meaning.[251]

Aveanna's proffered reading is not reasonable. The Refund Provision declares that a refund is "payable to the extent such refund . . . is based on [t]ax positions that are claimed with a 'more likely than not' level of comfort, as reasonably determined in consultation with Seller pursuant to the provisions of this Section [] and *Section 6.9(e)* [*i.e.*, the Cooperation Provision]."[252] An organic reading of the Refund Provision's cross-reference to the Cooperation Provision is

---

[248] *Williams I*, 2016 WL 3576682, at *11.

[249] *Id.*

[250] *See Dell, Inc. v. Magnetar Global Event Driven Master Fund Ltd.*, 177 A.3d 1, 40–41 (Del. 2017) (observing, in the context of creating reserves for potential "tax benefits," that the payor first must "recognize[] the financial statement effects of a tax position when it is more likely than not . . . the position will be sustained upon examination" (emphasis and internal quotation marks omitted)); *see also LSVC Holdings, LLC v. Vestcom Parent Holdings, Inc.*, 2017 WL 6629209, at *7–8, *12 (Del. Ch. Dec. 29, 2017) (finding reading of "more likely than not" standard that would govern tax positions during the return phase the most "consistent with ordinary business practice").

[251] *See, e.g.*, *In re Verizon Ins. Coverage Appeals*, 222 A.3d 566, 572–74 (Del. 2019) (interpreting the "plain meaning" of contractual term "securities claim" in reference to meaning the term "securities" has under federal and state securities statutes and rules).

[252] SPA § 6.9(f) (emphasis added).

that the parties must have "determined" a "more likely than not level of comfort" on the "[t]ax positions" "claimed" during the Cooperation stage. In other words, the "more likely than not level of comfort" must have been reached before the Companies' tax returns were filed, not after Aveanna received the refund. Similarly, the Refund Provision's self-reflexive reference ("reasonably determined . . . pursuant to this Section []") connects the comfort level to Aveanna's duty to file an "IRS Form 1139."[253] Consistent with the Cooperation Provision, Aveanna must "consult[]" with Epic before filing that return form so the parties can take "tax positions" with a "more likely than not" comfort level.

The Refund Provision's treatment of clawback claims further underscores that Aveanna must release the return unconditionally. Under the Refund Provision, if the IRS claws back a refund "for any reason," Epic (or its investors) pays the Government, not Aveanna.[254] Put differently, if the IRS concludes the Companies were wrong to think their tax return positions had been "more likely than not" passable, Epic faces disgorgement, not Aveanna.[255] Although it is true that, in this situation, the Government would pursue Aveanna (via the Companies) until Epic

[253] *Id.*
[254] *Id.*
[255] This part of the Refund Provision brings the "more likely than not" language closer to a condition subsequent, assuming it can be a condition at all. *See, e.g.*, *Shire*, 2020 WL 6018738, at *18 (explaining conditions subsequent). If so, proving the condition subsequent had been satisfied would be Aveanna's burden, not Epic's. *Id.*

intervenes, Aveanna, a sophisticated counterparty, accepted that reality.[256] Accordingly, Aveanna's leading theory in favor of a condition—*i.e.*, covering a deficiency judgment while Epic absconds with the original check—is unfounded.

In sum, it makes little sense, as Aveanna has argued, for the parties to strategize tax positions with a "more likely than not" comfort level during the Refund stage. Without tax positions, a return never would have been filed. Without a return, a refund never would have been disbursed. The "more likely than not" language plainly does not amount to a condition precedent.

In another trip to the well, Aveanna claims the "net of any taxes owed" or "net of any expenses owed" language in the Refund Provision also is conditional. According to Aveanna, this language implicitly references the Audit Provision, allowing Aveanna to guard the refund until an IRS audit is complete. This assertion, made elliptically in a paragraph in Aveanna's opening brief,[257] was not expanded meaningfully until Aveanna's reply[258] and only then most strenuously at oral argument.[259] An argument raised for the first time at a motion's hearing, or in a

---

[256] *See W. Willow-Bay Ct., LLC v. Robino-Bay Ct. Plaza, LLC*, 2007 WL 3317551, at *9 (Del. Ch. Nov. 2, 2007) ("The presumption that the parties are bound by the language of the agreement they negotiated applies with even greater force when the parties are sophisticated entities that have engaged in arms-length negotiations."), *aff'd*, 2009 WL 4154356 (Del. Nov. 24, 2009).

[257] D.I. 46 at 28–29.

[258] D.I. 55 at 12–14.

[259] Hr'g Tr. at 54, 58, 60, 62–64; *e.g.*, *id.* at 62 ("[Counsel for Aveanna]: 'I think [the Court] can give us judgment just on the net of any taxes owed [language].'").

reply brief, fairly may be deemed waived.[260]  But even if not waived, this argument would fail on the merits.

As an initial matter, Aveanna's analysis presupposes that an IRS audit is inevitable.  But Aveanna offers nothing in the SPA—or from commercial practice or experience generally—that suggests the Government always audits refunds.[261]  More importantly, Aveanna does not explain why the Court should imply a reference to the Audit Provision when the parties clearly knew how to cross-reference tax provisions explicitly when they wanted to do so.[262]  Indeed, courts routinely find the exclusion of a particular cross-reference is intentional and a byproduct of negotiation.[263]  In any event, the "net of any taxes owed" language does not reasonably signal the Audit Provision.  This language most naturally means a proper

---

[260] *E.g.*, *Emerald Partners v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999); *Ethica Corp. Fin. S.r.L v. Dana Inc.*, 2018 WL 3954205, at *3 & n.37 (Del. Super. Ct. Aug. 16, 2018).

[261] *But see* SPA § 6.9(b) (omitting the likelihood of an audit and instead discussing audit control procedures for "any audit"); *but see also* Hr'g Tr. at 63 ("The Court: 'But, again, the net of any taxes owed [language] assumes an automatic audit that is not referenced in the contractual language.'" "[Counsel for Aveanna]: 'It's there for a reason, and the reason is an automatic audit. . . . You don't need to know the ins and outs of audits. . . . It has a purpose.'"); *but see generally* Lang & Soled, *supra* note 247, at 427 (describing the "probability" of an IRS audit as "low").

[262] *See* SPA § 6.9(f) (explicitly referencing § 6.9(e)).

[263] *See, e.g.*, *McDonald's*, 2021 WL 351967, at *5 ("If the parties intended to incorporate [a separate provision], they would have been explicit, just as they were when incorporating other provisions. . . . Without this clear expression of intent, the Court has no cause to rewrite [the agreement] to include commitments the parties themselves chose not to incorporate." (citation omitted)); *Active Asset Recovery, Inc. v. Real Est. Asset Recovery Servs., Inc.*, 1999 WL 743479, at *11 (Del. Ch. Sept. 10, 1999) (finding that omission of a specific term in a contract "speaks volumes" about the parties' intent when construing included terms (citing 3 Corbin on Contracts § 552 (1960))); *see also Fortis Advisors LLC v. Shire US Holdings, Inc.*, 2017 WL 3420751, at *8 (Del. Ch. Aug. 9, 2017) (analogizing counterparties' omission of specific terms to the statutory canon of *expresio unius est exclusio alterius*, which provides that an omission presumptively is intentional when other terms are included instead).

refund reflects subtractions for ordinary "taxes owed" to federal or state authorities, such as when a taxpayer underpays her taxes during an income year.

Finally, even if the Court implied a reference to the Audit Provision, it would not lend Aveanna interpretive assistance. Under the Audit Provision, Epic presumptively controls an IRS audit. Epic may exclude Aveanna from an audit's defense entirely, preventing an opportunity mutually to recalculate for deductions.[264] A compulsory audit, therefore, still would not permit Aveanna to withhold a refund.

There are no conditions precedent in the Refund Provision. Aveanna unconditionally was obliged to remit the refund to Epic within ten business days of intercepting it. It did not. Accordingly, Aveanna is not entitled to judgment as a matter of law. To the contrary, Aveanna has violated the SPA by withholding the refund unless it can prevail on one of its fact-based affirmative defenses.

### 3. Aveanna is entitled to discovery on its defenses.

While this case still was pending in the Court of Chancery, Aveanna moved in the Court of Chancery under Rule 56(f) for an extension of time to respond to Epic's separately-pending summary judgment motion. Aveanna has argued discovery is necessary (i) to obtain extrinsic evidence of the parties' intent in drafting the Refund Provision; (ii) to prove Epic waived its right to challenge an immediate release of the refund; and (iii) to establish the existence of a post-closing

---

[264] SPA § 6.9(b).

modification to the SPA through which the parties agreed Aveanna could withhold the refund until the IRS's audit concludes. As set forth above, the Refund Provision is unambiguous, and Aveanna's request to discover extrinsic evidence of the parties' intent therefore is moot, leaving Aveanna's request to obtain discovery regarding its waiver and modification defenses.

Court of Chancery Rule 56(f) is identical to this Court's Civil Rule 56(f).[265] A motion under Rule 56(f) is directed to a court's "broad discretion."[266] "[A] party opposing summary judgment may, pursuant to . . . Rule 56(f), request limited discovery if it cannot present facts essential to oppose the summary judgment motion."[267] To invoke Rule 56(f), the requesting party must provide an affidavit stating the scope of proposed discovery.[268] The requesting party bears the burden of demonstrating the discovery proposed is specific and relevant "in light of applicable

[265] *Compare* Del. Super. Ct. Civ. R. 56(f), *with* Ch. Ct. R. 56(f).

[266] *Brick v. Retrofit Source, LLC*, 2020 WL 4784824, at *3 (Del. Ch. Aug. 18, 2020) (internal quotation marks omitted); *see Schillinger Genetics, Inc. v. Benson Hill Seeds, Inc.*, 2021 WL 320723, at *16 (Del. Ch. Feb. 1, 2021) ("The Rule 56(f) opportunity to present affidavits or engage in discovery . . . is necessarily circumscribed by the discretion of the trial court. . . ." (second ellipsis in original) (alteration omitted) (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1091 (Del. 2001))).

[267] *Corkscrew Mining Ventures, Ltd. v. Preferred Real Est. Fund Invs., Inc.*, 2011 WL 704470, at *3 (Del. Ch. Feb. 28, 2011).

[268] *Id.* at *3; *see* Ch. Ct. R. 56(f).

law."[269] An extension is appropriate where the core facts needed to oppose summary judgment "are within the exclusive knowledge" of the movant.[270]

Aveanna has complied with Rule 56(f)'s affidavit requirement.[271] Through the affidavits, Aveanna's Vice President of Tax has declared that Aveanna incurred significant expense in defending the IRS's audit solely because Epic had agreed to Aveanna's withholding of the refund.[272] Epic's agreement may express or imply a waiver—a fact-based inquiry.[273] A waiver or a modification may defeat a breach argument. But evidence of waiver or an agreement is not in the record or in Aveanna's possession. A scarce record on these questions, coupled with Aveanna's lack of possession and the specificity and relevance of its limited, fact-based requests, warrants an extension of time. Accordingly, discovery is appropriate before the Court considers summary judgment on Epic's tax refund counterclaim.

---

[269] *Schillinger Genetics*, 2021 WL 320723, at *16 (internal quotation marks omitted); *see Brick*, 2020 WL 4784824, at *3 ("[T]he onus is on the non-moving party to state with some degree of specificity . . . the additional facts sought by the requested discovery." (internal quotation marks omitted)).

[270] *Corkscrew Mining*, 2011 WL 704470, at *3.

[271] Ct. Ch. Dkt. 54, Exs. A & B; *cf. Comet Sys., Inc. S'holders' Agent v. MIVA, Inc.*, 980 A.2d 1024, 1033 (Del. Ch. 2008) (denying Rule 56(f) motion that had not been presented with an accompanying affidavit).

[272] *E.g.*, Ct. Ch. Dkt. 54, Ex. B ¶¶ 6–8.

[273] *E.g.*, *Topspin Partners, L.P. v. RockSolid Sys., Inc.*, 2009 WL 154387, at *2 (Del. Ch. Jan. 21, 2009) (deferring waiver as a jury question); *see also Realty Growth Invs. v. Council of Unit Owners*, 453 A.3d 450, 456 (Del. 1982) (observing that the facts surrounding waiver must be "unequivocal in character"). As a result, the Court rejects Epic's contractual anti-waiver arguments, as contractually afforded protections against waivers themselves may be waived if facts so indicate. *See Amirsaleh v. Bd. of Trade of City of N.Y., Inc.*, 27 A.3d 522, 529–30 (Del. 2011).

This case's procedural posture further supports that conclusion. Epic sought summary judgment in the Court of Chancery for specific performance of the tax refund. That motion has been transferred in its original form, and Epic intends to submit it that way. This Court, however, lacks subject matter jurisdiction to grant specific performance. The Court therefore cannot rule on Epic's unedited motion. That in mind, the Court of Chancery found Epic's "specific performance" claim truly presents a damages or declaratory claim. As a result, the motion is not doomed. Instead, Epic must brief its motion anew with legal, rather than equitable, arguments.[274] Accordingly, Epic's motion is denied without prejudice to it renewing that motion once the contemplated discovery is complete.

## C. Under the Escrow Agreement's plain language, Aveanna wrongfully withdrew the Escrow Funds.

The final issue raised by Aveanna's motion involves the Escrow Funds. Through its motion, Aveanna seeks a judgment that it is not violating the Escrow Agreement by continuing to hold the Escrow Funds while the parties' dispute continues.[275] To support that request, Aveanna first argues Epic has waived its right

---

[274] The Court is mindful of the Court of Chancery's correct observation that this Court ordinarily does not require a transferred litigant to re-brief motions submitted in a sister court. *Epic/Freedom*, 2021 WL 1049469, at *4–5 (citing 10 *Del. C.* § 1902). Epic, however, has not explained how the Court workably can reduce its unchanged equitable arguments to legal judgment. Given the unique litigation history of this case—and the administrative problems a second transfer undoubtedly would cause—it is appropriate to order Epic to file a new motion, should it decide that summary judgment remains a prudent course. For these reasons, this order should be deemed exceptional.

[275] At oral argument, Aveanna clarified that it does not seek a judgment that it "owns" the Escrow Funds. Hr'g Tr. at 69. Instead, Aveanna seeks a judgment that it rightfully may hold the Escrow

to challenge the Escrow Funds' early release by failing to file a Dispute Notice within the 30-day objection period. Aveanna then contends that, regardless of waiver, it properly obtained the Escrow Funds' early release by notifying Epic and the Escrow Agent of its Indemnification Claim at the same time. Aveanna's assertions call for interpretation of the Escrow Agreement and its interaction with the SPA. As discussed below, neither agreement validates Aveanna's non-conforming notice.

**1. Epic did not waive its challenge to the Escrow Funds' release.**

Under Escrow Agreement Section 4(b), Epic has 30 days to object to Aveanna's Indemnification Notice. If Epic does not object by that deadline, the Escrow Agent must release the Escrow Funds to Aveanna. Importantly, Section 4(b) does not provide that a failure to timely object to an Indemnification Notice precludes Epic from challenging that Notice by other means (*e.g.*, a breach of contract claim based on Section 4(b)). In fact, the opposite is true. Under the Escrow Agreement's No Waiver provision, a failure to exercise a right under the Agreement does not operate as a waiver of that unexercised right.[276]

---

Funds until it proves an indemnifiable Loss. *Id.* at 70–71. As a result, the Court does not reach the parties' arguments on whether a valid release establishes a permanent or temporary interest in the Escrow Funds.

[276] EA § 15.

On this plain language, Epic's failure to file a Dispute Notice is not fatal to its challenge to Aveanna's possession of the Escrow Funds. Assuming an Indemnification Notice properly is delivered, a failure to file a Dispute Notice allows Aveanna to hold the Escrow Funds while its Indemnification Claim is resolved.[277] A timely Dispute Notice simply would block an early release; it would not transmit a claim charging a breach of the Escrow Agreement. A breach claim therefore can be pursued in addition to, or in spite of, a timely Dispute Notice. Accordingly, the No Waiver provision saves Epic from an argument that a Dispute Notice is a prerequisite to suing for breach of the Escrow Agreement.

Aveanna's argument to the contrary relies on cases that did not consider anti-waiver language. For example, in *HC Companies, Inc. v. Myers Industries, Inc.*,[278] the agreement penalized untimely objections to an escrow release with a waiver.[279] The seller missed the deadline. As a result, and without anti-waiver language, the Court of Chancery ruled that the seller waived a challenge to the release.[280]

Similarly, in *PR Acquisitions, LLC v. Midland Funding LLC*,[281] the parties structured their purchase and escrow agreements with two separate indemnification

---

[277] *See* SPA § 9.4(a)(iii) (providing that "Loss" must be proven before a party is entitled to indemnification).

[278] 2017 WL 6016573 (Del. Ch. Dec. 5, 2017).

[279] *Id.* at *6.

[280] *Id.* at *6, *8.

[281] 2018 WL 2041521 (Del. Ch. Apr. 30, 2018).

notice procedures.[282] The Court of Chancery found that providing an indemnification notice under the purchase agreement, but not the escrow agreement, would result in a waiver of the right to challenge an escrow release.[283] Citing "human error," the buyer did not file a notice under either agreement before the expiration date.[284] By consequence, the court deemed a challenge to the escrow release waived. In doing so, the court enforced contractual compliance strictly, finding no exception (*e.g.*, anti-waiver language) to the buyer's notice duties.[285]

Finally, in *Winshall v. Viacom International, Inc.*,[286] the parties agreed indemnification claims would be lost unless they were made within 18 months of the transaction's closing. The buyer made its first three claims during that window, but did not make its last claim until after the window closed.[287] As justification for delaying its fourth claim, the buyer argued that "placeholder" language in its timely notices had reserved the buyer's right to bring future claims at any time.[288] The Court of Chancery rejected that unilateral attempt to extend the deadline, explaining the sellers expressly had bargained for repose in the form of a cut-off date.[289] Here,

---

[282] *Id.* at *6 n.66.
[283] *Id.* at *6–7. The Court of Chancery did not use the term "waiver," but its ruling is to that effect.
[284] *Id.* at *6.
[285] *Id.* at *7.
[286] 2012 WL 6200271 (Del. Ch. Dec. 12, 2012), *aff'd*, 76 A.3d 808 (Del. 2013).
[287] *Id.* at *8.
[288] *Id.*
[289] *Id.*

however, Epic expressly bargained for the No Waiver provision. Accordingly, the Escrow Agreement permits Epic's challenge.

**2. Aveanna failed to deliver "an Indemnification Notice" "to Epic and the Escrow Agent" "concurrently."**

**a. The SPA and the Escrow Agreement contemplate different Notices.**

SPA Section 9.2(a)(i) authorizes Aveanna to seek indemnification from Epic for inaccuracies in the SPA's representations and warranties. To do so, Aveanna must send Epic an Indemnification Claim Notice. One purpose of an Indemnification Claim Notice is to inform Epic of an Indemnification Claim. In context, another purpose of an Indemnification Claim Notice is to provide Epic with an opportunity to investigate and respond to the claim. That is why, under SPA Section 9.5, an Indemnification Claim Notice triggers Epic's inspection rights. Section 9.5 opens a pathway to Aveanna's books and records, review of which Epic may need to mount a defense to an Indemnification Claim. Under the SPA, a books and records demand may be made at any "reasonable" time. There is no other concrete deadline for making a books and records demand or for answering an Indemnification Claim Notice generally.

If Aveanna "makes a claim for indemnification . . . [under] Section 9.2" of the SPA, and wishes to extract the Escrow Funds early, Aveanna gains an additional

76

duty under the Escrow Agreement.[290]  To obtain control over the Escrow Funds, Aveanna must "deliver concurrently to the Escrow Agent and Seller a written notice (an 'Indemnification Notice')."[291]  As observed previously, the Escrow Agreement's Indemnification Notice is titled and defined differently than the SPA's Indemnification Claim Notice.  An Indemnification Notice also serves different purposes.  An Indemnification Notice (i) alerts the Escrow Agent to an active Indemnification Claim; (ii) starts the clock on the Escrow Agent's early release duties; and (iii) affords Epic an opportunity to lodge a Dispute Notice within 30 days.  As further evidence that the Indemnification Notice is a separate document, the Escrow Agreement does not incorporate SPA Section 9.5—*i.e.*, where the concept of an Indemnification Claim Notice resides.  It only incorporates SPA Section 9.2—*i.e.*, where the concept of an Indemnification Claim resides.

That the parties contemplated two separate notices is reasonable in light of their decision to draft separate objection procedures.  Those procedures, in turn, have distinct purposes.  Under the SPA, Epic may object to an Indemnification Claim Notice at any reasonable time.  Epic's objection goes to a Claim's merits.  Epic's inspection rights under the SPA are designed to facilitate Claim resolution between the parties.  The "reasonable" time parameters offer generous latitude for doing so.

---

[290] EA § 4(b).
[291] *Id.*

In contrast, under the Escrow Agreement, Epic must object to an Indemnification Notice within 30 days. Epic's Dispute Notice does not go to the merits of an Indemnification Claim. Instead, Epic's Dispute Notice is designed to mediate practical control over the Escrow Funds while an Indemnification Claim is pending. Given the involvement of capital and a third party (the Escrow Agent), a more rigid timeframe is sensible. The Escrow Agent, who otherwise would be investing the Escrow Funds,[292] must ensure they are liquid by a specific time. And the Funds' value, which fluctuates, may be determined more predictably when there is a specific day on which the Escrow Funds will be released. That is particularly important because Buyer may choose the exact amount subject to early release, including the full amount available to Seller on the Final Escrow Release Date.

Looking to each agreement as a whole, an Indemnification Notice and an Indemnification Claim Notice are not the same, although they may contain much of the same content. To discharge the parties' mutual intent, Aveanna must deliver both Notices to their designated addressees in order to commence the Escrow Funds' early release process.

### b. Epic did not receive an Indemnification Notice.

Aveanna sent Epic an Indemnification Claim Notice when it determined Defendants may have committed contractual fraud. Epic responded 33 days later,

---

[292] *See id.* § 3(a).

contesting the allegations and invoking its inspection rights. The timing plainly was reasonable. The response plainly was reasonable. The SPA's notice and objection procedures were respected.

At the same time, and on the same day, Aveanna sent the Escrow Agent—but not Epic—an Indemnification Notice. The Escrow Agreement, however, unambiguously affords Epic the right to receive an Indemnification Notice, too. The Escrow Agreement requires delivery of "an Indemnification Notice" "to the Escrow Agent *and* Seller."[293] Aveanna attached a copy of Epic's Indemnification Claim Notice in its message to the Escrow Agent. But Aveanna did not attach a copy of the Escrow Agent's Indemnification Notice in its message to Epic. Without knowledge that Notice had been sent to the Escrow Agent, Epic could not have been expected to file a Dispute Notice with the Escrow Agent. Without a proper Indemnification Notice, Aveanna was prohibited from accessing the Escrow Funds. Accordingly, Aveanna is not entitled to judgment as a matter of law on its continued possession of the Escrow Funds.

Aveanna resists this conclusion by advancing a few unreasonable readings of the parties' agreements. Aveanna begins by arguing an Indemnification Notice and an Indemnification Claim Notice are interchangeable. But that position gives no meaning to two differently-titled and defined terms that exist in two separate

---

[293] *Id.* § 4(b) (emphasis added).

contracts executed with different procedures and transactional aims. Indeed, it is difficult to imagine the parties engineered their agreements using Aveanna's construction. It would not be rational for the parties to execute a $950 million arrangement by which Seller can learn of a transaction-based Indemnification Claim, contest it, and then decide to defend it, under the SPA, but still be deemed uninterested in the fate of the Claim's funding—which also constitutes sale consideration—under the Escrow Agreement. Strict compliance with two different Notices and Notice procedures closes this circle.[294]

Relatedly, Aveanna insists a single Indemnification Notice is not required by the Escrow Agreement. But the Escrow Agreement's plain language expresses singularity. Section 4(b) declares Aveanna must deliver "*a* written notice (*an* 'Indemnification Notice')."[295] Far from grammatical trifles, the singular articles evince deliberation. Without "a" single Indemnification Notice, Epic would be caught unawares by an early release. And, as here, the Escrow Agent incorrectly would believe that Epic is indifferent to Aveanna's race toward the Escrow Funds.

Aveanna next cites Black's Law Dictionary to bolster its view that, even if a single Notice were required, its two Notices functioned as one because both Epic

---

[294] *See PR Acquisitions*, 2018 WL 2041521, at *6–7 & n.66 (observing that strict compliance with a purchase agreement's notice procedures, without more, does not amount to strict compliance with a contemporaneously executed escrow agreement's separate notice procedures as well).
[295] EA § 4(b).

and the Escrow Agent learned of the Indemnification Claim "concurrently"—*i.e.*, "at the same time." This effort fails at its inception because notice of an Indemnification Claim is not equivalent with notice of a request for the Escrow Funds' early release. Even so, in attempting to redefine the two Notices, Aveanna redefines "concurrent," too. Black's defines concurrent not as "at the same time," but rather as "*operating* at the same time."[296] Black's elsewhere defines "operate" as "to function properly."[297] Similarly, generic dictionaries define operate as "to produce an appropriate effect."[298] Taken together, an Indemnification Notice only "function[s] properly" if it "produce[s]" the "appropriate" effect of notifying the Escrow Agent and Epic "at the same time" of Aveanna's intent to obtain an early release of the Escrow Funds.

Notice delivered "at the same time" would be "simultaneous," not concurrent. "Simultaneous" describes an event's timing only.[299] "Concurrent" describes an

---

[296] *Concurrent*, *Black's Law Dictionary* (11th ed. 2019) (emphasis added); *but see* D.I. 46 at 16 (noting the word "operating" but then omitting it to focus only on the phrase "at the same time").

[297] *Operate*, *Black's Law Dictionary* (2d online ed.), https://www.thelawdictionary.org/operate (last visited July 9, 2021).

[298] *Operate*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/operate (last visited July 9, 2021). The Supreme Court has compared Merriam-Webster with Black's in construing undefined terms. *E.g.*, *Spintz v. Div. of Fam. Servs.*, 228 A.3d 691, 700 (Del. 2020); *USAA Cas. Ins. Co. v. Carr*, 225 A.3d 357, 360 (Del. 2020). Accordingly, the Court follows that example. *See Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006) ("Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract."); *accord In re Solera Coverage Appeals*, 240 A.3d 1121, 1132 n.67 (Del. 2020).

[299] *Simultaneous*, Merriam-Webster.com, https://www.merriam-webster/dictionary/simultaneous (last visited July 9, 2021) ("existing or occurring at the same time; exactly coincident").

event's timing and its effect.[300] To illustrate the difference, Black's uses "concurrent interest," with a reference to "concurrent estate," as an example.[301] A concurrent interest in land, such as a joint tenancy, is a property right owned by "two or more persons at the same time."[302] Joint tenants have the right to occupy the land "simultaneously," but they need not do so. A unified conveyance of ownership rights "at the same time" in the same title is enough to make their "concurrent" interest "operate."[303] Stated negatively, the joint tenancy right is ineffective unless granted pursuant to a single instrument.[304] By analogy, the same is true for an Indemnification Notice. It is ineffective unless it is singular (*i.e.*, the same Notice), transmits the same content, is addressed to Epic and the Escrow Agent, and is delivered to them at the same time.

For completeness, Black's also defines concurrent as "covering the same matters,"[305] which likewise is a contextually apt definition.[306] A single

---

[300] *See supra* notes 295–98 & accompanying text.
[301] *Concurrent*, *Black's Law Dictionary* (11th ed. 2019).
[302] *Concurrent Estate*, in *id.*(using joint tenancy as an example).
[303] *See, e.g.*, *Banks v. Banks*, 135 A.3d 311, 317–18 (Del. Ch. 2016) (applying the four "unities" of a joint tenancy, of which same "title" and "time" are two (internal quotation marks omitted)).
[304] *See* 2 Tiffany on Real Property § 418 (3d ed. 2015) ("Joint tenants have one and the same interest, *accruing by one and the same conveyance*, *commencing at one and the same time*, and held by one and the same undivided possession." (emphasis added)).
[305] *Concurrent*, *Black's Law Dictionary* (11th ed. 2019).
[306] *See Tetragon Fin. Grp. Ltd. v. Ripple Labs Inc.*, 2021 WL 1053835, at *4 (Del. Ch. Mar. 19, 2021) (explaining that "the mere existence of multiple definitions does not itself create ambiguity" where context suggests one definition is more appropriate than others); *E.I. du Pont de Nemours & Co. v. Admiral Ins. Co.*, 711 A.2d 45, 59 (Del. Super. Ct. 1995) ("If the mere existence of different dictionary definitions constitutes an ambiguity, drafting unambiguous contractual

Indemnification Notice addressed both to the Escrow Agent and Epic that "cover[s] the same matter[]"—the Escrow Funds' early release—delivered "at the same time" plainly is what the parties meant by "concurrently." Properly construed, then, Aveanna sent an Indemnification Notice—which covers one matter—to the Escrow Agent, and an Indemnification Claim Notice—which covers another matter—to Epic, *simultaneously*. Aveanna failed to send an Indemnification Notice to the Escrow Agent and Epic *concurrently*.

As a last resort, Aveanna departs from its plain meaning analysis and speculates that Aveanna or the Escrow Agent would have told Epic about the Indemnification Notice if Epic just had asked. But Escrow Agreement Section 4(b) contains no duty to inquire. Rather, the parties bargained for a single Indemnification Notice that informs all parties of the same claim at the same time. The Court will not insert contractual obligations that Aveanna, a sophisticated entity, willingly chose to omit.[307]

Once Aveanna made an Indemnification Claim, it did not need to pursue the Escrow Funds' immediate release.[308] When it did, however, it plainly was required

---

language would be impossible without defining almost every word. Standing alone, multiple dictionary definitions do not prove all differing definitions are reasonable." (citation omitted)).

[307] *See W. Willow-Bay*, 2007 WL 3317551, at *9 (observing that sophisticated parties especially are bound by the contract language they voluntarily choose); *cf. NAMA Holdings*, 948 A.2d at 419 (observing that the inclusion of a certain term is intentional and must be given effect).

[308] *Compare* D.I. 46, Ex. B (Indemnification Notice dated Dec. 21, 2017), *with* EA § 4(f) (scheduling Escrow Final Release Date for Mar. 16, 2018), *and* EA § 4(b) (permitting the Buyer to request an early release at "any time prior" to the Final Escrow Release Date).

to send Epic an Indemnification Notice. It did not. Accordingly, Aveanna is not entitled to judgment as a matter of law as to its continued possession of the Escrow Funds.

## CONCLUSION

For the foregoing reasons, the parties' motions for judgment on the pleadings are **DENIED**, Aveanna's Rule 56(f) motion is **GRANTED**, and Epic's summary judgment motion is **DENIED WITHOUT PREJUDICE**.

**IT IS SO ORDERED.**